UNITED STATES of America

v.

**Wade L. WALKER, Lance Corporal (E–3), U.S. Marine Corps.**

NMCCA 9501607.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 2 July 1993.

8 July 2008.

For Appellant: Col D.W. Sullivan, USMCR; LtCol J.R. Perlak, USMC; LCDR J.S. Grover, JAGC, USN; Maj Richard Belliss, USMC; LT M.J. Navarre, JAGC, USN; LT S.C. Reyes, JAGC, USN; LT R. McWilliams, JAGC, USN; Hardy Vieux.

For Appellee: Maj R.E. Beal II, USMC; Capt Roger Mattioli, USMC; Capt G.R. Hines, USMC.

Before WAGNER, ROLPH, and VINCENT, Senior Judges.

**PUBLISHED OPINION OF THE COURT**

WAGNER, Senior Judge:[1]

In a trial before officer members, sitting as a general court-martial, the appellant was found guilty, contrary to his pleas, of two specifications of conspiracy to commit premeditated murder and other offenses, two specifications of violation of a general order, two specifications of premeditated murder, and one specification each of robbery, adultery, and kidnapping.[2] The members sentenced the appellant to death, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority (CA) approved the sentence as adjudged. The appellant raises 158 assignments of error (AOE), 43 of which are summary in nature.[3]

### Factual and Procedural History of the Case

On 26 March 1992, Lance Corporal (LCpl) Rodney L. Page, United States Marine Corps (USMC), was found dead, having suffered a shotgun blast to the abdomen. Four days later, on 30 March, LCpl Christopher Q. James, USMC, was also discovered dead, the result of a shotgun blast to the chest. The following day, 31 March, the appellant was apprehended in connection with the killings and placed into pretrial confinement. On 22 April, charges of murder, conspiracy, orders violations, adultery, and assault were preferred against the appellant. In the wake of an Article 32, Uniform Code of Justice, 10 U.S.C. § 832, preliminary investigation into the offenses, the charges, including capital offenses, were referred to a general court-martial on 28 September 1992. The following day, 29 September, the appellant was arraigned at an Article 39(a), UCMJ, session. Later Article 39(a) sessions were convened on 16 dates between 5 October 1992 and 15 June 1993.

---

1. Although Senior Judge Wagner detached from this court in 2007, on 7 February 2008 the Judge Advocate General appointed Captain David A. Wagner, JAGC, USN, as a senior judge of the Navy–Marine Corps Court of Criminal Appeals, with the appointment "limited to [his] participation in the decision of the case of *United States v. Lance Corporal Wade L. Walker*, NMCCA No. 9501607 and any subsequent request for reconsideration filed in compliance with CCA Rule 19."

2. The offenses violated Articles 81, 92, 118, 122, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 918, 922, and 934.

3. The AOEs are summarized in the Appendix to this opinion.

During the course of the trial, which lasted from 19 June to 2 July 1993, the appellant attempted to elect trial by military judge alone, but was afforded trial by officer members in accordance with RULE FOR COURTS-MARTIAL 201(f)(1)(C), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1984 ed.)[4] and entered pleas of not guilty to all charges and specifications. The members convicted the appellant of conspiracy to commit the premeditated murder of, armed robbery of, and assault with a loaded firearm upon LCpl Page; conspiracy to commit the premeditated murder and kidnapping of LCpl James; two specifications of violation of a general order banning the possession of unregistered firearms; the premeditated murder of LCpl Page by shooting him in the chest with a shotgun; the premeditated murder of LCpl James by shooting him in the chest with a shotgun; the armed robbery of LCpl Page; adultery with Mrs. Victoria James, wife of LCpl James; the kidnapping of LCpl Page; and the kidnapping of LCpl James. The members sentenced the appellant to death, forfeiture of all pay and allowances, and reduction to pay grade E–1.[5] On 1 March 1994, the military judge, Colonel H.K. Jowers, USMC, authenticated the 2055 page, 12–volume record of trial. On 19 October 1994, the staff judge advocate prepared a recommendation, followed over the next 9 months with addenda in response to clemency matters and comments submitted by the appellant. On 21 June 1995, the CA approved the sentence as adjudged.

The record of trial was docketed with this court on 10 August 1995. Over one year later, on 16 August 1996, the appellant filed a motion to remand his case for proper post-trial processing. Following oral argument on the motion, the motion was granted on 13 September 1996, with direction that the new post-trial processing be completed by a different convening authority. A new staff judge advocate's recommendation (SJAR) was completed on 19 May 1997 and a new CA's action (CAA) was completed on 10 July 1998, again approving the sentence as adjudged. The record of trial was once again docketed with this court on 18 August 1998. Over the next several years, there was much appellate activity involving filing of motions by the appellant and answers on the part of the Government. In 2004, the appellant sought relief from our superior court on the issue of improper assignment of judges to the panel considering his case, culminating in a 9 December 2004 remand of the case to our court for corrective action and completion of our review. The appellant filed his initial 497–page brief and assignments of error on 30 June 2005.

Pursuant to this court's order, the Government trifurcated its answer, filing segments on 24 March, 26 May, and 10 July 2006. The appellant filed reply briefs on 21 April 2006 and 13 October 2006. The court heard oral argument on 23 February 2007, during which we expressed concern regarding AOE LXV, alleging error in the military judge's extensive use of R.C.M. 802 sessions during trial. The Government filed a supplemental response on this issue on 23 March 2007 and the appellant filed a reply on 11 April 2007.

After considering the voluminous record of trial and all of the many appellate filings in this case, we will set aside the sole specification of Charge IV, robbery. We affirm the finding of guilty to Specification 1 of Charge III, premeditated murder of LCpl Page, except for the language "with premeditation." The remaining findings are affirmed. A rehearing as to the excepted language and the set aside finding of guilty will be authorized. The sentence is also set aside and a rehearing on sentence will be authorized.

### The Government Case–in–Chief

The Government began its case by calling Delbert D. Comes Flying, a former Marine who was driving on U.S. Highway 17 near Jacksonville, North Carolina, on the evening of 26 March 1992, when he saw two African-American males with "Marine haircuts" chase a Caucasian male near an establishment called "Snoopy's." Mr. Comes Flying

---

4. R.C.M. 201(f)(1)(C) states that a military judge alone has no jurisdiction to try an offense for which the death penalty may be adjudged.

5. R.C.M. 1004(e) states that the sentence of death carries with it a dishonorable discharge for enlisted members.

testified that he saw one of the African-American males carrying a shotgun or rifle. The appellant was not one of the men. The witness then drove a safe distance away and stopped, where he saw one of the African-American men run across the road carrying a shotgun and get into a waiting car. Later, the witness accompanied police to Snoopy's, where he saw the Caucasian male being loaded into an ambulance.

The Government's second witness was Sergeant (Sgt) David B. Shepard of the Onslow County Sheriff's Department (OCSD). He testified that he responded to a radio call reporting shots fired near Snoopy's, where he discovered an unconscious gunshot victim, LCpl Page.

The next Government witness was Sgt Robert L. Pollack Jr., OCSD, who was off-duty when he heard the call reporting shots fired near Snoopy's. As Sgt Pollack continued to drive home, he saw two vehicles stopped at the entrance to a nearby neighborhood. A white Chevrolet Corsica bearing Illinois tags "MRS W 4" was one of the vehicles. He noted that the vehicles were together when he first saw them and then one looped around and came back alongside the second vehicle again. After one of the vehicles flashed its lights, the cars both left the area.

Deputy Paul Starzynski, OCSD, testified that he seized LCpl Page's clothes from the trauma team at the hospital and turned them over to the evidence technician, Sgt Sunny Sampson, OCSD. Sgt Sampson then testified that he secured the clothing and retrieved wadding and pellets removed from LCpl Page's body during the autopsy.

Dr. Walter Gable, a regional medical examiner, testified that he conducted the autopsy on LCpl Page. Dr. Gable concluded that the cause of death was a gunshot wound to the abdomen that destroyed LCpl Page's liver, perforated his aorta, and substantially damaged other internal organs.

LCpl Christopher P. Hickey, USMC, testified that he lived in the barracks with LCpl Fuller and LCpl Adams. The appellant, LCpl McDonald, LCpl Brown, and LCpl Parker lived in the room next door. Shortly after evening chow on 26 March 1992, the witness knocked on his neighbors' door to borrow a broom. LCpl McDonald opened the door just a crack and handed the broom to LCpl Hickey. The witness thought this behavior unusual and out of character for the normally outgoing LCpl McDonald. LCpl Hickey testified that the appellant, LCpl Brown, LCpl Adams, and LCpl Curry were in the room with LCpl McDonald. Later, the witness saw the appellant and LCpl Parker heading toward the parking lot together.

The Government next called LCpl McDonald, then serving his sentence for conspiracy, robbery, kidnapping, and murder, for which he had pled guilty under the terms of a pretrial agreement. LCpl McDonald testified that on 26 March 1992, he, the appellant, LCpl Curry, and LCpl Parker brought food back from the dining hall to their barracks room. Other Marines dropped by and, as was usually the case for them on Thursday nights, they consumed alcohol. The witness testified that he left the barracks around 1900 and returned around 2200 to find all the alcohol consumed by the other Marines. Shortly thereafter, LCpl Parker began discussing a rumor concerning Caucasian males trying to hang an African-American male somewhere on the base. LCpl Parker stated that something had to be done about it and said, "We're going to get us a white boy tonight." Record at 841. The group of Marines left the room without LCpl McDonald. Thereafter, the witness went to the parking lot where he saw the appellant walking toward the barracks with a shotgun, which the appellant normally kept in the trunk of his vehicle. LCpl McDonald identified the appellant's vehicle as a white Chevrolet Corsica with Illinois license plates "MRS W 4." *Id.* at 842. LCpl Brown also had a shotgun.

The witness testified that the appellant stated, "[o]ne of those motherf* * * * *s is going down tonight," *id.* at 843, then put the shotgun in the back seat of his vehicle. The group split in two, with part of the group in the appellant's vehicle and part in LCpl Brown's vehicle. LCpl McDonald drove the appellant's car because the appellant had consumed too much alcohol, but the appellant

was able to communicate clearly and to walk without difficulty. LCpl Adams was in the vehicle with the appellant and the witness, while LCpl Brown, LCpl Parker, and LCpl Curry were in LCpl Brown's vehicle, driven by LCpl Curry.

After stopping for gas and purchasing additional alcohol, the two groups went in search of a random victim. During the trip, the appellant showed LCpl Adams how to load the shotgun. LCpl McDonald testified that, while his vehicle was in the lead, they passed a Caucasian male walking along the side of the road. The appellant said, "That's one right there. You let him get by." *Id.* at 850. The vehicles stopped and a discussion ensued, after which the appellant told LCpl McDonald that they would take the victim's wallet to make it look like a robbery and that LCpl Curry would now be in the lead.

After another stop at a gas station so that one of the group could use the restroom, the vehicles approached a bar on U.S. Highway 17, where the group spotted a Caucasian male walking alone. The appellant stated that he was "the guy" they were going to get and told the witness to follow LCpl Curry. The vehicles pulled off the road and LCpl Parker and LCpl Adams left the vehicles, both with shotguns. There was an audible gunshot and LCpls Adams and Parker ran back to the vehicles and got in. LCpl Adams reported to the group in his vehicle that LCpl Parker had shot the victim. The appellant wanted to know if LCpl Adams had shot the victim as well, to which he replied he had not. The appellant was upset that LCpl Adams had not shot the victim, as well.

The witness testified that the appellant then asked if they had gotten the victim's wallet. LCpl Adams handed over the wallet, which the appellant stated he would burn. The witness then testified that the groups headed back out onto the highway in the two vehicles. The vehicles stopped in a residential area and the Marines got out. LCpl Parker and the appellant were excited as LCpl Parker and LCpl Adams recounted how the victim had begged for his life. LCpl Parker told the group that he had told the victim they weren't going to shoot him and they just wanted his wallet. After the victim gave them his wallet, LCpl Parker stated that he, LCpl Parker, turned as if he was going to walk away, then swung back around and shot the victim at close range. The group then discussed an alibi.

The appellant directed LCpl McDonald to a residence in nearby Midway Park, where the appellant went inside for several minutes. When he emerged, the appellant placed his shotgun in the trunk of the vehicle parked in front of the residence and went back inside. After a few minutes, the appellant returned to the car and they returned to base. Upon their arrival, they saw LCpl Brown's vehicle being searched at the gate, so LCpl McDonald elected to enter the base through another gate. The groups reunited at the barracks.

LCpl McDonald also testified that he was aware of the ongoing sexual relationship between the appellant and Vicky James, the wife of a fellow Marine, LCpl James. The appellant admitted the affair to the witness, as well as the fact that he did not like the way LCpl James mistreated his wife. The appellant stated that he purchased the shotgun to protect himself from LCpl James. The appellant also told LCpl McDonald that he went to the trunk of his car on one occasion while at the James' household to get his shotgun because LCpl James was questioning his wife about an affair and had knocked her to the ground. However, Vicky James came toward him and shook her head "no." The appellant told LCpl McDonald that he would "take care of" LCpl James. Record at 866. On a separate occasion, the appellant told the witness that he would lure LCpl James away from his house by telling him there was a party at the barracks and then would shoot him.

LCpl McDonald also testified that, on 30 March 1992, the appellant came to his barracks room and left with LCpl Parker. The pair returned to the room 15 or 20 minutes later and departed shortly thereafter stating that they were going to LCpl Neikirk's house. Later that day, the appellant telephoned the witness and said "It's done." *Id.* at 871. When LCpl McDonald asked what the appellant meant, the appellant responded, "Rock-a-bye baby." *Id.* The witness still

did not understand and the appellant said he would explain later. The witness testified that he heard the line before during a video game, "New Jack City," when a character jumps out of a vehicle and shoots another character. *Id.*

During cross-examination, LCpl McDonald acknowledged that he heard that LCpl James physically abused his wife, Vicky, and that they had sought counseling for the abuse. The witness also stated that there was discrimination within the platoon and that LCpl Parker was a violent person. He also testified that the entire group of Marines was drunk the night of 26 March 1992. The witness stated that the reason the group left the barracks was to get more alcohol and that he went along to keep the group of intoxicated Marines from getting into trouble. It seemed to the witness that LCpl Parker was wild and drunk when talking about "getting a white guy" and that the other Marines were laughing him off at that point.

The Government next presented the testimony of LeVern Hayes, formerly a Marine lance corporal, who stated that the appellant came to his residence in Midway Park about 0100 on 27 March 1992 and stated that "something bad happened." *Id.* at 906. The appellant said that the group of Marines he was with had been driving around in two vehicles when LCpl Parker got out of one vehicle and shot a Caucasian male. The appellant stated that the group had earlier been discussing the rumor of a group of Caucasian males trying to lynch an African–American male on Martin Luther King Day. The appellant asked to leave his shotgun in the trunk of the witness' car and that it was not the shotgun used in the killing. The witness agreed and the appellant put the shotgun in the vehicle, stating that he would retrieve it at another time. Later on that same day, the appellant caught up with the witness at the laundromat and retrieved the shotgun.

Mr. Hayes testified that the appellant lived with LCpl James and his wife at one point and that LCpl James abused his wife. The witness stated that the appellant was afraid of LCpl James and was normally a sober, moral person. The appellant's wife left him while he was in Saudi Arabia and the appellant was depressed over the split from his family. The witness stated that the appellant was remorseful when talking about the murder of LCpl Page.

LCpl Brown testified next, relaying essentially the same facts that made up the substance of LCpl McDonald's testimony. LCpl Brown was also serving a sentence for conspiracy, robbery, kidnapping, and murder, to which he pled guilty under a pretrial agreement. LCpl Brown stated that the discussion of a lynching was first brought up by LCpl Curry and that it was Curry who urged the group to go out looking for a Caucasian male after LCpl Parker had first mentioned the idea. The shotgun used by LCpl Parker did not belong to the witness; he was keeping it in the trunk of his car for the owner. After the two vehicles went separate ways following the murder, LCpl Curry's group went to the house of a friend of LCpl Parker's, where Parker left the shotgun. LCpl Curry threw the expended shotgun shell into the bushes—it was later found by investigators led to the scene by the witness.

LCpl Brown testified that LCpl Parker told him he and the appellant burned the wallet taken from LCpl Page. LCpl Brown also testified that the appellant had taken the shotgun, at his request, to a storage facility and placed it there for safekeeping, along with an unexpended shell from LCpl Brown's vehicle. The witness also testified that the appellant admitted having an affair with Vicky James and that the appellant purchased his shotgun because he was afraid of LCpl James. LCpl Brown concluded his direct testimony by stating that, on 30 March 1992, LCpl Parker and the appellant were, for reasons unstated, at the barracks looking for black shirts and the appellant was talking about Vicky James. The pair left the barracks, stating that they were going to LCpl Neikirk's to look at a handgun.

On cross-examination, LCpl Brown stated it was clear to everyone in the group that they were driving around looking for a Caucasian male to shoot. He said that LCpl Parker was the instigator and, without LCpl Parker, there never would have been a shoot-

ing on 26 March 1992. In response to a member's question, the witness stated that the appellant told him on 30 March 1992 that Vicky James wanted her husband dead.

Omega Moorer testified that she had been dating LCpl Parker for about nine months when, on 26 March 1992, he arrived at her house and asked her to keep a gun in a camouflage case for him. She agreed. LCpl Parker returned to her house the following day with the appellant and LCpl Brown, and retrieved the gun. They departed in the appellant's vehicle. Special Agent Thomas P. Marzilli, Naval Criminal Investigative Service (NCIS), then testified that he retrieved the spent shotgun shell from the bushes near the house where LCpl Brown had thrown it the night of the murder of LCpl Page.

Vicky James testified next. She discussed her marriage to LCpl James and indicated that they had marital problems for a while, including some mild physical abuse such as him pushing her or knocking her down during arguments. The marital difficulties dissipated after they sought counseling. The witness testified that she began her sexual relationship with the appellant while he was temporarily living in her house. Both of them were married and having difficulties in their relationships. Mrs. James stated that LCpl James had threatened to kill her, but had never threatened the appellant. She stated that her husband never found out about her affair with the appellant.

Mrs. James testified that, on one occasion, her husband knocked her to the ground and the appellant, who witnessed this, opened the trunk of his car where his shotgun was located. She went to the appellant and shook her head, indicating "no" nonverbally, then got into the car with the appellant and left. While in the car with Mrs. James, the appellant threatened to kill LCpl James. The following morning, the appellant called the witness and said he reported the abuse by LCpl James to his first sergeant and he could no longer go to the James household. He told her that LCpl James was mad at him for making the complaint. Thereafter, on 20 March 1992, the witness and her husband began counseling.

On 29 March 1992, the appellant called the witness and they met at a hotel, where they engaged in sexual relations. Mrs. James' children were present and being watched by a friend of the appellant's in the hotel room while the appellant and the witness had sex in the bathroom. The witness testified that she wanted to end the relationship with the appellant, but had difficulty doing so. The friend who watched the children later told Mrs. James that the appellant did not like the way that LCpl James treated Vicky, and the appellant would kill LCpl James if he had to in order to protect her.

On 30 March 1992, the appellant came to the James' house with an African–American friend, both dressed in black shirts. She heard the name "Parker" mentioned, but cannot identify who the man was that accompanied the appellant that day. The appellant told Mrs. James that her husband was going to "get done," record at 1042, which she took to mean get hurt. She stated she didn't want anyone to get hurt, but the appellant said he would "do him" in the house and drag his body out. *Id.* Again, the witness told the appellant that she did not want that to happen. The appellant told Mrs. James that he would lure LCpl James away from the house and she told the appellant LCpl James would not go with him because he did not trust the appellant. The appellant and his friend left. Mrs. James tried to call her husband, who was visiting a friend, but the line was busy. The appellant then called Mrs. James from a pay phone and told her that she was not dealing with an amateur, and that he had done this before. She asked when and he replied, "Thursday." *Id.* at 1045. The appellant stated that he had just seen LCpl James drive by his location.

Shortly after LCpl James arrived home, and while Mrs. James was on the telephone with LCpl James' mother, the appellant and his friend returned to the house and knocked on the door. LCpl James answered the door. He and the appellant engaged in conversation and were heard laughing. LCpl James, on another extension, told his mother he was going to the barracks with friends to a party and that he had to go. He then kissed Mrs. James and left with the appellant

and LCpl Parker. Mrs. James saw two vehicles leave the area. The witness testified that she did not believe anything would happen because the two men were getting along and laughing. She later fell asleep on the sofa.

Mrs. James went on to testify that the appellant called her house later that same evening, asking if anybody from the base had come to the house, telling her that he had "done it" and stating that she "had her divorce." *Id.* at 1048. The witness took this to mean that her husband had been killed and she asked the appellant how he knew. The appellant told her that his buddy had done it and he had seen it done. The appellant described seeing LCpl James shot in the stomach and his body jerk forward and stated that he was going to clean up his car before going back to base. The appellant called again later to tell her that her car, which LCpl James had been driving, was parked down the street from her house. The witness stated that she didn't want to believe that her husband was dead and, after putting her son to bed, went to bed herself. She awoke to a chaplain knocking on her door to inform her that her husband was dead. The witness testified that she never asked anyone to kill her husband and that she did not want him to die.

On cross-examination, Mrs. James testified that physical abuse at the hands of her husband began shortly after they married. He would have temper tantrums, where he would throw things against walls and yell at the children. Once, he hit her with a fan he had thrown. LCpl James' violent behavior scared her. His temper and drinking got worse after they moved on base. LCpl James admitted during counseling to serial spousal abuse and alcohol abuse. LCpl James cheated on her. Once, she caught him with hickeys on his neck and, on another occasion, she found love letters between him and his paramour. LCpl James, on the other hand, suspected his wife of infidelity and threatened to kill her on more than one occasion. He stated that he would never let her leave him. She feared LCpl James. It was in the midst of this emotional turmoil

that she had turned to the appellant and entered into a sexual relationship with him.

Vicky James continued her testimony by stating that the appellant witnessed the abuse she suffered at the hands of her husband. The appellant told her he did not like it and that he would protect her. However, he never confronted LCpl James or intervened during the altercations he witnessed. The witness stated that she was not happy that the appellant had reported the abuse, as she did not want anyone to know. The witness admitted she never told the appellant not to kill LCpl James, but she did tell him she did not want anyone to get hurt and she did not want any part of what the appellant was going to do. The witness admitted that LCpl James didn't trust the appellant and that she did not call the police, even though she thought it possible that the appellant was serious about killing her husband. The witness stated she never left her house on the night her husband was killed.

Desiree Tensley, the wife of a Marine and a friend of the appellant's, testified that the appellant told her about LCpl James' abuse of his wife and that he wanted to kill LCpl James. In mid-March 1992, the appellant bought a gun from a pawn shop. The witness worked as an assistant manager at a "Super 8" motel. The appellant stayed at the motel on 29 March 1992 and Vicky James visited him there with her children. The appellant later told the witness he intended to kill LCpl James and that he had told Vicky James he was going to do it. When the witness asked how Mrs. James had responded, the appellant stated she had not told him not to do so. The witness tried to discourage the appellant, but he appeared to be determined.

In an effort to prevent trouble, the witness testified that she telephoned Mrs. James and asked if she knew that the appellant intended to do something serious to LCpl James, to which Mrs. James answered, "Yeah." During the phone conversation, the witness tried to convince Mrs. James to dissuade the appellant, but she responded that marriage counseling wasn't working and that it was "either going to be her or her husband," because if he found out about her affair he would kill

her. The appellant came in to Mrs. James' house during the conversation and took the phone from her, telling the witness that it was "going to happen tonight." Record at 1105. Later, at around 2200, the appellant called the witness and said, "It's done." *Id.*

The Government next called Corporal (Cpl) Willie R. Scott, USMC, who testified that he saw the appellant and LCpl Parker get into the appellant's vehicle around 1800 on 30 March 1992 and depart the barracks parking lot. LCpl Adam T. Neikirk, USMC, then testified that the appellant and LCpl Parker came by his home unannounced around 1745 on 30 March 1992. They discussed an upcoming deployment and guns. LCpl Neikirk showed the appellant his .38 caliber handgun, which was in a case next to the couch. The appellant then took the witness outside to show him the shotgun he possessed in the trunk of his car. The appellant offered to show LCpl Neikirk the shotgun, but he declined, as the shotgun was loaded. The appellant and LCpl Parker left together in the appellant's car around 1815. LCpl Neikirk testified that the animosity between the appellant and LCpl James was common knowledge in the unit. LCpl Neikirk overheard the appellant say that he was going to "get James" before "James did him." *Id.* at 1128.

Sgt Edward R. Bodge, USMC, testified that, on the evening of 30 March 1992, he was stopped at his mailbox in his vehicle when he heard a loud "boom" to his left and saw a vehicle quickly backing down a rarely used road. The vehicle entered the paved road and drove away quickly. Suspicious, Sgt Bodge followed the vehicle, a white Chevrolet Corsica, and noticed it had two African–American males in it. The license plate from Illinois read "MRS W 4." When the witness returned to his residence, he was stopped by military police who informed him the road was closed. He disclosed to them what he had heard and seen and he was escorted to the crime scene.

The Government's next witness was Scott W. Bryan, a former Staff Sergeant (SSgt) in the Marine Corps. Mr. Bryan was walking from his residence to his neighbor's mobile home around 2010 when he heard a gunshot. He saw a white Chevrolet Corsica and another white vehicle depart the area and he went to investigate, thinking perhaps someone had shot a deer. He found LCpl James' body. Unable to detect a pulse, Mr. Bryan had his wife call the military police and an ambulance. He then returned to the body and continued trying to find a pulse. As he did so, he heard another vehicle start nearby and depart the area rapidly. He did not get a good look at the vehicle, but noted that it did not have its headlights on.

Special Agent Marzilli was recalled and testified that he responded to the crime scene on 30 March 1992, took photographs, and collected clothing and other evidence. He also attended the James autopsy and gathered evidence from the body. Next, Commander Jimmy W. Green, Medical Corps, United States Navy, testified that he performed the autopsy on LCpl James. The cause of death was a shotgun blast to the chest which tore the heart in two, caused massive internal injuries, and left a gaping wound in the victim's chest. He opined that the blast distance was no more than 3 to 5 feet. The victim's Blood Alcohol Level (BAC) was .11 mg/dl.

Anthony Davis, formerly Sgt Davis, USMC, testified that, on 30 March 1992, the appellant asked him if he (the appellant) could park his car at Mr. Davis' house. The witness made excuses and did not agree to this. Later, at around 2230, the appellant and LCpl Parker came to the witness' house and the appellant again asked if he could park his car there. The witness said that he could get shot coming to his house that late, to which the appellant answered, "That has already happened twice." Record at 1218. The witness did not want the car left there in case it was damaged. The appellant then asked to use the telephone, which he took into the bathroom with him. The appellant made a third plea to park the car at the house, which the witness declined. The appellant then took the telephone back into the bathroom and carried on another telephone conversation. The appellant then went outside and was going through the trunk of his car, which struck the witness as odd. The

appellant and LCpl Parker thereafter departed in the appellant's vehicle.

On cross-examination, Mr. Davis described the appellant as a peaceful person and a devoted husband and father always welcome in his home. The appellant was openly depressed about his wife leaving him and lived "like a hermit" for a time thereafter. According to Mr. Davis, the appellant was not a violent person. The witness knew about LCpl James' abuse of his wife and about the sexual relationship between Vicky James and the appellant.

Phillip A. Sartor testified that he had been a lance corporal in the Marine Corps on 30 March 1992 and was part of the conversation between the appellant and Anthony Davis regarding the appellant parking his car at the Davis home. The witness offered to let the appellant park the car at his house and the appellant said he would bring the car over after work. At about 2050, Anthony Davis called the witness and said that he thought LCpl Parker and the appellant were on their way to Phillip Sartor's house. Shortly thereafter, the appellant and LCpl Parker knocked on the witness' door. The appellant asked to use the telephone and took it into the bathroom. When he emerged, the appellant asked for and was given a rag, which he took outside to his car. Before the witness drove the appellant and LCpl Parker back to base, the appellant took the rag and opened the trunk of his vehicle, wiping down the bumper for about two minutes. On the way to the base, the appellant told the witness that, if anyone asked, he should say they were with the witness all day. At 0300 the following morning, law enforcement arrived at the witness' house and seized the appellant's vehicle.

On cross-examination, Mr. Sartor described the appellant as a peaceful person who never spoke violently or got drunk. According to Mr. Sartor, the appellant talked and cried a lot about his estranged wife and children. Mr. Sartor described LCpl James as a violent person.

Special Agent Marzilli was recalled. He testified that he located a storage bin belonging to the appellant and faxed a search warrant to agents standing by at the location. Master Sergeant (MSgt) Thomas R. Biller, USMC, testified that he participated in the search of the appellant's storage bin. Two shotguns were seized, one with a spent shell still in it. Special Agent Eugene E. Bishop, North Carolina State Bureau of Investigation (NCSBI), testified that the wadding from the seized shells and the wadding from the body of LCpl Page were manufactured by the same company. The spent shell in the shotgun had similar markings to the spent shell found in the bushes near the home of Omega Moorer, but the witness could not state conclusively from which gun the shells had been fired.

The Government called Special Agent William K. Raper, NCSBI, to testify that he found blood spatters on the rear bumper of the appellant's Chevrolet Corsica. The witness also took fiber samples and fingerprint samples from the vehicle, but could not match any of them to LCpl James. Special Agent Peter D. Deaver, NCSBI, testified that he was a forensic serologist and also found blood spatters on the rear bumper of the vehicle and the license plate. He testified that he analyzed the blood pattern and determined that the blood spatters were caused by a blast wound in the proximity of the vehicle. The witness stated that the blood spatters matched LCpl James's blood, as would 15% of the general population's. Special Agent Marzilli was then recalled to testify about custody of blood samples.

Raymond D. Meeks, a forensic chemist, testified that the blood spatters did not match either the appellant's or LCpl Parker's blood. Allen W. Driggers then testified regarding his sale of the shotgun to the appellant on 27 February 1992. SSgt David C. Schilling III, USMC, testified that the shotgun was registered on-base under the name of a dependent wife, Karen Cox. Chief Warrant Officer Second (CWO2) Greg H. Swenson, USMC, testified that he searched the appellant's personal effects and seized some items, including a receipt from a "Super 8" motel. Special Agent John W. Bendure, NCSBI, a specialist in fiber analysis, tested fibers from the appellant's vehicle and those from a pair of white sweatpants found at the scene of LCpl James' murder. He

testified that he found an association, or similarity, between them, but not a conclusive match.

Special Agent Ronald Marrs, NCSBI, a firearms and toolmark expert, testified that, based on his testing, he determined conclusively that the spent shell casing found in the appellant's shotgun had been worked through the action of the gun, but could not state conclusively if it had been fired from that shotgun. Special Agent Ernest R. Peele, Federal Bureau of Investigation (FBI), testified that he tested the pellets found in LCpl Page's body and that they had lead composition indicating they came from the same box or lot of ammunition as the pellets in live rounds recovered from the shotgun provided by LCpl Brown. Likewise, the pellets recovered from LCpl James' body came from the same box or lot of ammunition as the pellets in the live round recovered from the appellant's shotgun.

The Government finished its case-in-chief with several brief witnesses, including testimony regarding a note passed back and forth between LCpl Parker and the appellant that purported to list those persons who were "on our side" and those who were "not on our side." Among the items of evidence admitted on behalf of the Government were: the shotguns provided by the appellant and LCpl Brown, photographs of clothing from the victims, reports from autopsies and testing of evidence, recovered shotgun shells, and physical evidence recovered from the scene of both crimes.

The appellant presented the testimony of several witnesses that he was a peaceful person and that LCpl McDonald and Mrs. James were not truthful persons. Additionally, the appellant offered the testimony of Frederick E. Schmidt, the Chief Metallurgist at Remington Arms Company, who disagreed with the testimony of Special Agent Marrs that the testing of the pellets could indicate that they came from the same box or lot of ammunition as those from another shell. After explaining the manufacturing process, the witness made it clear that the Government expert was incorrect on this point.

The appellant also presented the testimony of Dr. Raymond N. Fox, Jr., an expert in addiction medicine. Dr. Fox testified that the appellant was suffering from alcohol-induced acute organic brain syndrome, rendering him unable to control his impulses on the night that LCpl Page was murdered. Dr. Fox also testified that the appellant's Intelligence Quotient (IQ) of 87 could have been below 80 on that evening as a result of the acute brain condition and could have qualified him as mentally retarded. The appellant did not testify.

### Standard of Review in Capital Cases: "Death is Different"

Our superior court has recognized that the Supreme Court "considers that the death penalty is unique and that the procedure used to impose it requires a greater degree of judicial scrutiny." *United States v. Matthews*, 16 M.J. 354, 377 (C.M.A.1983). The Supreme Court has continuously echoed one theme since the late 1960s in their decisions in death-penalty cases: "reliability of result." *United States v. Murphy*, 50 M.J. 4, 14 (C.A.A.F.1998). The reliability of the result trumps all other concerns in death-penalty cases and the appellate courts are called upon to ensure that the adversarial system has functioned properly. *Id.* at 14–15. The essential elements are "competent counsel; full and fair opportunity to present exculpatory evidence; individualized sentencing procedures; fair opportunity to obtain the services of experts; and fair and impartial judges and juries." *Id.* at 15 (citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)).

In the words of former Chief Judge Cox:

[T]o ensure that those few military members sentenced to death have received a fair and impartial trial within the context of the death-penalty doctrine of the Supreme Court, we should expect that:

1. Each military service member has available a skilled, trained, and experienced attorney;

2. All the procedural safeguards prescribed by law and the Manual for Courts–Martial have been followed; and

3. Each military member gets full and fair consideration of all pertinent evidence, not only as to findings but also as to sentence.

*United States v. Curtis,* 48 M.J. 331, 332 (C.A.A.F.1997)(Cox, C.J., concurring).

We follow our superior Court's guidance in reviewing this and all death-penalty cases by testing the result of the court-martial against the whole record before us to determine whether we should affirm the findings and sentence in the appellant's case. *Murphy,* 50 M.J. at 14. This standard of review is tempered with the caveat that we will not overturn the findings or sentence of a court-martial on an error of law unless the error materially prejudiced the substantial rights of the appellant. Art. 59(a), UCMJ; *Murphy,* 50 M.J. at 15. Of course, we also enjoy an "awesome, plenary, de novo power of review" that allows us to substitute our judgment for that of the military judge or the members and to independently determine, based on the whole record before us, which findings and sentence should be approved. Art. 66(c), UCMJ; *United States v. Cole,* 31 M.J. 270, 272 (C.M.A.1990). Ultimately, "[w]e must be satisfied that the adversarial process has worked, and that appellant has had a fair and complete trial." *Murphy,* 50 M.J. at 15.

Indeed, "death is different," and this becomes the fundamental principle of our review of a capital case. *Loving v. United States,* 62 M.J. 235, 236 (C.A.A.F.2005)(quoting *Ring v. Arizona,* 536 U.S. 584, 605–06, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)("There is no doubt that 'death is different.'") (citation omitted)); *United States v. Curtis,* 32 M.J. 252, 255 (C.M.A.1991)(recognizing that "[t]he Supreme Court, however, has made clear the Eighth Amendment requires a different treatment of death-penalty cases."). Recognizing, then, the "unique severity and irrevocable nature of capital punishment," we have reviewed the record before us charged with the duty to ensure a completely fair and reliable result. *Loving,* 62 M.J. at 236.

**Factual and Legal Sufficiency**

■ The appellant alleges in AOE XXVI-II, XXIX, XXX, and CXII that the evidence adduced at trial was factually and legally insufficient as to the findings of guilty to the conspiracy to commit the premeditated murder of LCpl Page, the premeditated murder of LCpl Page, the premeditated murder of LCpl James, the kidnapping of LCpl James, and the robbery of LCpl Page. Following our review of the record of trial and the pleadings of the parties, we conclude that the evidence adduced at trial left no reasonable doubt as to the guilt of the appellant to all charges and specifications. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987); *United States v. Reed,* 51 M.J. 559, 561–62 (N.M.Ct.Crim. App.1999), *aff'd,* 54 M.J. 37 (C.A.A.F.2000); *see* Art. 66(c), UCMJ.

The evidence of the appellant's guilt adduced at trial in regard to the LCpl Page offenses was overwhelming. That evidence left no doubt whatsoever that the appellant conspired with five fellow Marines to randomly seek out and murder a Caucasian male in retaliation for alleged past instances of racial violence directed against African–Americans, including the rumored attempted lynching of an African–American male. Combining group bravado with alcohol, the conspirators armed themselves with two shotguns, one supplied by the appellant, and departed their barracks in two vehicles. Along the way, the conspirators engaged in various discussions of how and where to find their victim and how to make the murder look like a robbery by taking the victim's wallet. The appellant showed LCpl Adams, USMC, how to load and use the appellant's shotgun. Throughout the episode, the appellant and another conspirator, LCpl Parker, issued racial epithets and urged the group to hunt down and kill a Caucasian. The appellant was the one who suggested that they take the victim's wallet to make it look like a robbery. The group eventually found a lone Caucasian male, LCpl Page, near a bar.

LCpl Parker and LCpl Adams, armed with shotguns, departed the vehicles, forced the victim at gunpoint behind the bar and took his wallet. LCpl Parker then shot LCpl Page once in the abdomen at close range, causing his death. The appellant asked for, and received, the victim's wallet from LCpl Adams, indicating that he would destroy it. The appellant then participated in planning an alibi for the group and hiding the weapons and other evidence.

There is no doubt that, less than a week later, the appellant and LCpl Parker entered into another conspiratorial agreement to lure LCpl James, the husband of the appellant's paramour, away from his house and murder him. They accomplished their task by inviting him to come with them to a non-existent "party" in the barracks. The two conspirators then took LCpl James to a remote location and murdered him in the same general manner that they murdered LCpl Page. The appellant later told Victoria James that his "friend" (i.e., LCpl Parker) had actually done the shooting, but that he was present and had seen it done.

The Government's case against the appellant was based not on the theory that he had physically pulled the trigger of either murder weapon, but that he was guilty of murder, robbery, and kidnapping as a principal due to his involvement in the planning and execution of the crimes, and because he participated in disposing of evidence and establishing alibis following the murders. In fact, the trial defense counsel conceded in his opening statement on the merits, given before the presentation of the Government's case-in-chief, that the appellant and his vehicle were present at the scene of both murders and reinforced that statement during argument on findings, where the thrust of his comments focused solely on degree of culpability.

Taken together, the evidence and testimony presented by the Government left no reasonable doubt of the appellant's guilt on all offenses. The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements of each offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319,

99 S.Ct. 2781. For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt of each offense beyond a reasonable doubt. *Turner,* 25 M.J. at 324–25.

We conclude that a reasonable fact finder could properly have found, beyond a reasonable doubt, that the appellant committed each of the offenses of which he stands convicted. Moreover, after careful consideration, we are ourselves convinced beyond a reasonable doubt that the appellant committed each of those same offenses. Again, the evidence of the appellant's guilt to all charges and specifications was overwhelming.

## Defense Request for Continuance

In AOE VIII, the defense contends that the military judge abused his discretion by denying the defense request for a continuance to allow the substitute expert on addiction medicine time to prepare to testify. To the extent that the testimony impacted on the issue of voluntary intoxication related to the issue of specific intent with regard to the robbery and premeditated murder of LCpl Page, we agree.

The offense of robbery requires proof beyond a reasonable doubt of a specific intent element; that the accused intended to deprive the victim permanently of the use and benefit of the property taken during the robbery. Art. 122, UCMJ; *Simmons v. United States,* 554 A.2d 1167, 1170 (D.C.1989)("Robbery, of course, is a specific intent crime"). Likewise, for the offense of premeditated murder, the Government must prove beyond a reasonable doubt that the accused premeditated the murder, i.e., consciously conceived the act, formed the specific intent to kill someone, and considered the act intended. Art. 118, UCMJ; *United States v. Loving,* 41 M.J. 213, 279 (C.A.A.F.1994)("Premeditated murder requires proof of an additional element, 'premeditated design to kill.' ")(quoting Art. 118(1), UCMJ).

Evidence of voluntary intoxication may be introduced at trial to negate the specific intent element. R.C.M. 916(*l*)(2); *see United States v. Benton,* 57 M.J. 24, 30

(C.A.A.F.2002). Voluntary intoxication, while not recognized as negating *mens rea* generally, even with regard to the intent to kill under premeditated murder, has been uniformly recognized as a defense if it impacted the appellant's ability to form the specific intent required to prove premeditation. *United States v. Morgan,* 37 M.J. 407, 413 (C.M.A.1993)(citing *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir.1987) and *Kane v. United States,* 399 F.2d 730, 736 (9th Cir.1968)). Thus:

> One who voluntarily intoxicates himself or herself cannot be heard to complain that they were incapable, by virtue of that intoxication, of committing intentionally the acts leading to the death of another human being. While the law may mitigate and recognize that one in a voluntarily induced intoxicated state may not have the capacity to carefully premeditate and willfully and deliberately carry out a murder, thus reducing premeditated murder to a lesser offense, it does not mitigate or forgive one whose conduct reflects an intent to kill or inflict great bodily harm.

*Id.* This principle has long been recognized in the law. "If the degree of intoxication is such as to prevent the formation of the particular intent requisite to a specified crime, the accused may not be responsible for that offense, but only for a lesser offense included within it which does not require the specified intent." *United States v. Ferguson,* 38 C.M.R. 239, 240, 1968 WL 5376 (C.M.A.1968)(citing *United States v. Backley,* 9 C.M.R. 126, 1953 WL 2618 (C.M.A.1953)).

The question before the court does not involve the affirmative defenses of mental responsibility or partial mental responsibility.[6] While the availability of a partial mental responsibility defense was questionable at the time of the appellant's trial, there is no doubt that the appellant was able to avail himself of evidence tending to negate the specific intent element of premeditation. *Ellis v. Jacob,* 26 M.J. 90, 91–93 (C.M.A.1988).

During the trial, testimony was elicited regarding the amount of alcohol ingested by the appellant and his co-actors on the evening that LCpl Page was murdered. The defense engaged the assistance of an expert in addiction medicine, Dr. Hambidge, who had spent over 45 days preparing his testimony for trial. His specific area of expertise concerned the effects of alcohol on the cognitive areas of the mind. The defense intended to call Dr. Hambidge as a witness to testify with regard to the appellant's ability to premeditate the murder of LCpl Page. Shortly before he was to testify, however, according to trial defense counsel, Dr. Hambidge attempted to bargain with the trial defense counsel for testimony helpful to the appellant. Again, according to the trial defense counsel, the doctor wanted the trial defense counsel to influence NCIS to investigate the doctor's wife and, in exchange, the witness would provide testimony "very favorable" to the appellant. Without such an agreement, the trial defense counsel stated, the doctor would provide bland testimony. The trial defense counsel immediately alerted the military judge and all parties agreed that not calling the witness was ethically and legally mandated at that point. The convening authority authorized the employment of a substitute expert, Dr. Fox.

Dr. Fox was provided the appellant's medical record on a Friday morning and the trial defense counsel indicated that, depending on the doctor's evaluation, the defense team might seek additional time in order to complete an accurate assessment and evaluation. When the court-martial reconvened the following Monday morning, the defense counsel informed the court that Dr. Fox would need more time to prepare. The military judge denied the request, leaving Dr. Fox with only the weekend to prepare for his testimony. Having been denied what he deemed adequate time for his expert to prepare, the trial defense counsel astutely asked that the trial counsel not be allowed to cross-examine Dr.

---

6. The defense of partial mental responsibility was available under the 1969 version of the Manual for Courts–Martial. *See* R.C.M. 916(k), MCM 1969. However, the 1984 Manual changes substantially altered the landscape by stating that, "A mental condition not amounting to a lack of mental responsibility under subsection (k)(1) of this rule is not a defense, nor is evidence of such a mental condition admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense." R.C.M. 916(k), MCM 1984 (Change 3).

Fox on the basis of the limited amount of time he had to assess the appellant, arguing that it was important that the members not receive a skewed perception that the doctor had walked in just three or four days earlier and was just "winging it." Record at 1575. The military judge agreed. The defense called Dr. Fox to testify as to the appellant's mental state on the night that LCpl Page was murdered.

Having been recognized as an expert in addiction medicine, Dr. Fox described his examination of the appellant. Dr. Fox opined that, on the night of LCpl Page's murder, the appellant was suffering from acute alcohol intoxication and, as a result, had developed a complication of alcohol intoxication known as organic brain syndrome. One factor that Dr. Fox considered in arriving at his diagnosis was the appellant's IQ score of 87. The witness testified that the alcohol consumption conceivably could have reduced the functional ability of the appellant to the level of a handicapped or mentally retarded person. The witness explained organic brain syndrome as "characterized by confusion, disorientation and decreased intellectual functioning. It may be accompanied by high levels of fear or irritability and occasionally by hallucinations." *Id.* at 1595. Dr. Fox also testified that, at the time the appellant left the barracks to retrieve his shotgun from his car on the night of 26 March, he was "functioning as a person who has lost all inhibitory control of behavior; who has lost his cognitive abilities to tell him what to do; and to use a common phrase, he has become a literal 'loose cannon.' He has no control over his faculties." *Id.* at 1598. In the doctor's opinion, throughout the car ride and the killing of LCpl Page, the appellant was "acting purely on impulse not on rational or conscious control of his behavior." *Id.* Dr. Fox also testified that the appellant "developed a significant personality change under the influence of alcohol; whereas before he was quiet, reserved and withdrawn, at this point, he became loud, obnoxious and, in effect, exhibited behavior that wouldn't have occurred under normal circumstances." *Id.* at 1600. Dr. Fox concluded that, "this change in a quiet, reserved person's behavior was purely due to loss of conscious control,

disinhibition and someone functioning with lower cognitive functions than he might have had earlier." *Id.*

In spite of the military judge's earlier ruling regarding cross-examination based on the witness' time to prepare, the trial counsel began his cross-examination by stressing limitations in Dr. Fox's preparation. There was neither objection from the trial defense counsel nor admonition from the military judge. The trial counsel emphasized that Dr. Fox had not personally interviewed LCpl McDonald, Mr. Frank Hall, or Mr. LeVern Hayes. Dr. Fox also conceded to the trial counsel that such interviews would have been helpful and that he had not read LCpl McDonald's testimony. During his cross-examination, the trial counsel also asked whether Dr. Fox had considered when the IQ test was taken and the appellant's statement to the examiner that he was curious to know how the results of the test might help in his defense. When Dr. Fox replied that he had only considered the IQ score itself, the trial counsel responded that it was stated on the first page of the examination sheet, forcing the witness to state that he had only read the score from the second page and had not read the first page.

One of the members proposed a question to Dr. Fox. Appellate Exhibit CCIX. The member wanted to ask how long the doctor spent with the appellant, whether the interviews were conducted over long periods of time, and whether Dr. Fox felt he had sufficient time to make an accurate judgment. During an Article 39(a) session held to discuss the members' proposed questions, the trial defense counsel noted that he had asked the court for more time when the court had convened that morning and his request had been denied. The trial defense counsel went on to state that Dr. Fox would answer that he had done the best with what he had and that he is confident in his analysis to date, but that more time would have been appropriate in this case. The trial defense counsel then indicated that the question, as posed by the member, was more prejudicial than probative at this point. The military judge, indicating that the issue was of concern to one of the members, stated that, if the de-

fense objected to the question—which in the judge's mind would end up leaving that member wondering—the question would not be asked.

Another member proposed a question regarding whether the witness had reviewed the appellant's service record and, more specifically, whether he had compared the IQ test score to the appellant's ASVAB test scores. The trial defense counsel objected to the question. The military judge then questioned Dr. Fox outside the hearing of the members and elicited the fact that he had not reviewed the ASVAB score. When the members returned, the military judge explained to the members that the question would not be asked because the witness had not reviewed the ASVAB scores. Dr. Fox was the last witness the defense called. The Government did not introduce any expert to counter the voluntary-intoxication defense. *See United States v. Mitchell,* 51 M.J. 234, 242 (C.A.A.F.1999)(Crawford, J., dissenting)(noting Government presented testimony from an expert in addiction psychology that though the accused's blood alcohol content was high, he may have felt the effects of the alcohol to a lesser extent than would have been expected in someone with a less-developed tolerance).

■ We apply an abuse of discretion standard of review to the military judge's decision to deny the defense continuance. We will find an abuse of discretion where the military judge's rulings or underlying reasons are "clearly untenable" and where they "deprive a party of a substantial right such as to amount to a denial of justice." *United States v. Weisbeck,* 50 M.J. 461, 464 (C.A.A.F.1999)(quoting *United States v. Miller,* 47 M.J. 352, 358 (C.A.A.F.1997)). Our superior court has determined that " '[u]nreasonable and arbitrary insistence upon expeditiousness in the face of justifiable request for delay' is an abuse of discretion." *Id.* at 466 (quoting *United States v. Soldevila–Lopez,* 17 F.3d 480, 487 (1st Cir.1994)). The military judge heard no argument from counsel in denying the appellant's request for a continuance to allow Dr. Fox to prepare his testimony and provided no basis or explanation for his ruling. We do not, therefore,

have the benefit of his reasoning and thus can give little deference to his ruling. *United States v. Hollings,* 65 M.J. 116, 119 (C.A.A.F.2007)(holding military judge who addresses issue of challenge for cause on the record is entitled to greater deference than one who does not); *United States v. Manns,* 54 M.J. 164, 166 (C.A.A.F.2000)(noting the court gives military judges less deference if they fail to articulate their MILITARY RULE OF EVIDENCE 403 balancing analysis on the record, and no deference if they fail to conduct the balancing at all); *United States v. Forbes,* 59 M.J. 934, 939 (N.M.Ct.Crim.App.2004)(holding when a military judge gives a fail-to-testify instruction over defense objection, if he identifies the interests of justice in question but does not articulate his balancing of those interests with the defense objection, he is accorded less deference. If he does not identify interests of justice at all, the standard of review is *de novo.*), *aff'd,* 61 M.J. 354 (C.A.A.F.2005).

■ The Court of Appeals for the Armed Forces has identified twelve factors that are relevant in determining whether a military judge has abused his discretion in denying a continuance request: "surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice." *Miller,* 47 M.J. at 358 (quoting FRANCIS A. GILLIGAN & FREDRIC I. LEDERER, COURT–MARTIAL PROCEDURE § 18–32.00 at 704 (1991)).

■ 1. Surprise. While surprise is more commonly the result of some positive action by one party that was not and could not have been anticipated by the opposing party, the intervening circumstance of witness malfeasance on the eve of his testimony certainly placed the defense in an unexpected and unanticipated position that materially affected the appellant's presentation of evidence.

2. Nature of the evidence. The appellant asserts on appeal that Dr. Fox's testimony

"was the heart of the intended defense strategy" to the premeditated murder of LCpl Page. *Weisbeck*, 50 M.J. at 464. The evidence adduced at trial does indicate that the issue of whether the appellant was capable of forming the specific intent to commit robbery and premeditated murder due to voluntary intoxication was central to the defense case. The military judge gave the members an instruction on the issue prior to deliberations on findings. Aside from the evidence provided by witnesses regarding the alcohol consumption and behavior of the appellant on the night in question, and how that behavior differed from the normal pattern of behavior exhibited by the appellant, the testimony of Dr. Fox was the only evidence available to the defense that supported their theory. Dr. Fox represented the defense's only opportunity to establish that the appellant's participation in the murder was impulsive and out of control, was fueled by an organic brain disorder triggered by alcohol ingestion, and reduced his cognitive functioning to the level of a mentally retarded person.

3. Timeliness. The trial defense counsel was diligent in alerting the court-martial to the events that transpired as a result of the malfeasance of their initial expert. The trial defense counsel noted on Friday morning, when Dr. Fox was first provided with materials and access to the appellant, that the doctor would assess the information over the weekend and that the defense would ask for additional time if need be on Monday morning when the court next convened. The trial defense counsel did indicate that more time was needed. The defense request for a continuance was timely.

4. Substitute Testimony or Evidence. The record does not indicate that any substitute testimony or evidence for Dr. Fox's testimony was available to the appellant.

5. Availability of Witness. No issue was raised regarding the availability of Dr. Fox at a later time and date. We will assume he was available.

6. Length of continuance. The defense did not ask for a specific period of additional time; rather, they simply indicated that more time would be needed. The military judge did not inquire into how much time

would be needed; he just provided a one-word ruling, "Denied." Record at 1575. We agree with the appellant, who argues that this amounted to a denial of any continuance, no matter how reasonable the length.

7. Prejudice to Opponent. The Government did not assert any prejudice that would be suffered as a result of granting the requested continuance. Indeed, when the defense requested the continuance, the prosecution had completed the presentation of its entire case-in-chief and the defense had presented all of its witnesses with the exception of Dr. Fox. Again, we agree with the appellant that a reasonable delay under the circumstances of this case would not have prejudiced the Government, while the absence of such prejudiced the appellant.

8. Prior Continuances. There had been other continuances granted during the court-martial, but none had been granted to allow this critical witness to prepare to testify. The original 96 hours granted for Dr. Fox to prepare involved part of a Friday and two weekend days, so only one-half of a trial day had been lost to Dr. Fox's preparation at the time the continuance request was tendered.

9. Good Faith of Moving Party. Again, we agree with the appellant that the defense was acting in complete good faith in requesting more time for Dr. Fox to prepare. He had been given three days to do what the prior expert required a 45–60 day time period to accomplish.

10. Reasonable Diligence by Moving Party. The defense acted with reasonable diligence. In light of the military judge's failure to develop a record of the circumstances surrounding the continuance request, we will assume diligence.

11. Possible Impact on the Verdict. There is no doubt that at least one of the members had given some thought to whether Dr. Fox had prepared adequately for his testimony. The defense could not reasonably answer that member's question without exposing to the members that Dr. Fox, in his opinion and in the opinion of the trial defense counsel, had not had enough time to prepare, which would have further undermined his credibility. Further, although the military

judge had indicated he would not allow the trial counsel to cross-examine Dr. Fox on the amount of time he had spent in preparing for his testimony, the trial counsel was permitted to accomplish the same goal of undermining and weakening Dr. Fox's testimony by eliciting from him that he had not spoken to the key witnesses in the case, had not read their testimony, had not examined the ASVAB scores, and had not read the entire IQ testing package. To make matters worse, the military judge informed the members that Dr. Fox had not read the appellant's service record. We believe the members were left with the impression that Dr. Fox had not done a thorough job in preparing to testify and, therefore, did not give his testimony the weight it may otherwise have deserved.

12. Prior Notice. In *Weisbeck*, a child-abuse case in which the defense sought an expert witness to examine the alleged victims and determine whether their behavior was consistent with false allegations, the expert was unavailable to testify on the scheduled trial date, nine days after the defense asked for a continuance. *Weisbeck*, 50 M.J. at 463. The military judge denied the requested continuance and the Court of Appeals for the Armed Forces reversed the findings and sentence. *Id.* In applying the "prior notice" criteria, the court noted that nine days was insufficient time to find another expert and give the expert time to prepare to testify. *Id.* at 465. We agree with the appellant that the far shorter time period available in this case to identify a replacement expert and allow the expert time to study the accused's records and interview the accused and others who could shed light on this issue was insufficient.

Citing *United States v. Allen*, 31 M.J. 572 (N.M.C.M.R.1990), the Government argues that because the appellant bore the "responsibility to make a full and fair disclosure of the necessity for" the requested continuance, and because the trial defense counsel failed to make that showing, the military judge may not be criticized for denying the continuance. *Id.* at 620 (quoting *United States v. Nichols*, 6 C.M.R. 27, 36, 1952 WL 2270 (C.M.A.1952)). Recognizing that the appellant had the burden to demonstrate the rea-

sonableness and necessity for the requested continuance, we find that the reason for the continuance was evident based on the timely disclosures of the trial defense counsel and that the military judge afforded the appellant no opportunity to present additional evidence or even argument of counsel before issuing a terse, one-word ruling denying the request.

■ Under the unique circumstances of this case and, based on the scant record before us regarding the military judge's denial of the continuance request, we find that the military judge abused his discretion and erred in denying the request, and that the appellant was prejudiced by having this critical witness on the issue of specific intent compromised before the members. This was exacerbated by the trial counsel's cross-examination of Dr. Fox, highlighting the serious weaknesses in his preparation. The Government presented no contrary expert testimony, relying instead on the trial counsel's effective cross-examination of Dr. Fox.

The trial defense counsel all but conceded the appellant's participation in both murders, beginning with his opening statement to the members where he conceded that the appellant and the appellant's vehicle were at the scene of both crimes. In argument on findings, the trial defense counsel further focuses the members on the issue of premeditation in both murders and the issue of specific intent with regard to robbery, arguing that the evidence presented by the Government was scant and highlighting the testimony of Dr. Fox relating to the effects of voluntary intoxication.

The trial counsel, on the other hand, emphasized that Dr. Fox had relied almost exclusively on what the appellant had told him in arriving at his conclusions. Considering the stakes in a capital case, the appellant's life, we cannot say with certainty that he received a fair trial with regard to the issue of voluntary intoxication and his ability to form the specific intent to commit the robbery and premeditated murder of LCpl Page. We hold that the appellant was materially prejudiced by the military judge's ruling denying him a reasonable continuance to allow Dr. Fox to properly prepare as an expert witness on this critical issue. We note that,

while voluntary intoxication can mitigate against specific intent related to premeditation, thereby reducing premeditated murder to unpremeditated murder, it cannot reduce unpremeditated murder to a lesser offense. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1984 ed.), Part IV ¶ 43c(2)(c). Therefore, regardless of our corrective action regarding premeditated murder, the lesser included offense of unpremeditated murder remains viable and we may approve the lesser offense even if we set aside the finding of guilty to premeditated murder.

### Reopening Findings to Consider Specific Intent

During sentencing, the military judge ordered that the findings phase of the trial be reopened and that the members reconsider their verdict, after considering additional evidence, argument, and instructions on the issue of the appellant's ability to form the requisite specific intent vis-à-vis the element of premeditation in light of his voluntary intoxication.[7] The appellant asserts in AOEs II, III, IV, V, VI, and VII that the military judge erred during the reopened findings phase, variously, by refusing to allow the defense to present live expert testimony; by playing a tape recording of a portion of a defense witness' Article 39(a), UCMJ, session testimony to the members without any finding that the witness was unavailable; by failing to provide the members with sufficient instructions to adequately guide their deliberations on the reopened findings; by failing to correct plain error where the trial counsel's closing argument at the end of the reopened findings phase violated the appellant's rights against self-incrimination and due process; by allowing the trial counsel to comment on the appellant's right to remain silent during his rebuttal argument during the reopened findings phase; and by failing to grant a mistrial in violation of the appellant's Fifth, Sixth, and Eighth Amendment rights.

As the Supreme Court has observed, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own

defense.... Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois,* 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (citation omitted). We agree with the appellant that the military judge's erroneous rulings denied the appellant the protections of this fundamental right, and resulted in material prejudice.

■ However, the Government correctly argues that the military judge was not authorized to reopen findings *sua sponte* and that the proceeding should be considered a nullity. R.C.M. 924(a) is unambiguous on this point, stating that the "[m]embers may reconsider any finding reached by them before such finding is announced in open session." While R.C.M. 924(c) allows the military judge to reconsider his own findings in a judge alone trial at any time before he announces sentence, the military judge and the members are bound by the announcement of findings in a members case.

We note, however, that the military judge was concerned enough about the manner in which the issue of voluntary intoxication relating to specific intent had been handled during the merits of the case to take this most unusual and unorthodox procedural step. It is significant that the military judge recognized that this issue, critical to the members' deliberation on these offenses, had been inadequately dealt with during the merits of the case. This lends further support to our ruling regarding the denial of a continuance to allow Dr. Fox to adequately prepare to testify on the issue of specific intent, and mandates setting aside the findings of guilty to the premeditated murder and robbery offenses involving LCpl Page.

The appellant was very clearly denied an equal opportunity to present evidence during this stage of the proceedings. The military judge allowed the Government to introduce evidence, including the testimony of an expert, regarding the appellant's mental state and, without explanation, denied the defense's request to recall their expert witness

---

7. Interestingly, neither the military judge nor counsel seemed concerned about whether the issue of intoxication and the appellant's mental

state could be used to negate the specific intent required under the robbery charge.

on the same issue. Record at 1980–81. The military judge also refused to allow the members to consider Dr. Fox's written report as an alternative to his testimony. *Id.* at 1983; *see also* AE CCLI. Among the items of evidence introduced by the Government were written reports from two experts. Record at 1989, 1999; Prosecution Exhibits 185, 186.

The military judge also ordered the court reporter to play a portion of Dr. Phillips' Article 39(a) session testimony for the members. This was one of the experts that the defense had requested on the merits. The record of trial fails to disclose precisely what portion of this prior testimony was played. *See* Record at 1971–77, 1981, 1986. The defense could present no more than an affidavit from one of their experts. *Id.* at 2000.

To make matters worse, in his comments to the members on reopening the findings, the military judge informed the members that, "I am going this morning to allow counsel for both sides to reopen their cases on an issue that was raised via the testimony of Dr. Phillips yesterday.... [T]he issue of partial lack of mental responsibility ... is the issue on which counsel for both sides are going to offer additional evidence this morning." *Id.* at 1986. Having placed the idea in the minds of the members that both parties would be able to produce evidence on the issue, the military judge, by denying the appellant that opportunity, no doubt created in the minds of the members the conclusion that the defense had nothing to offer in response to the Government expert's opinions. This ruling lent undue credence to the Government's unopposed live testimony and created the appearance for the trier of fact that the defense team was virtually conceding the issue.

Once the military judge reopened the proceedings, he had a duty to offer a full and fair opportunity to both parties to present relevant evidence. This he did not do. We caution military judges, not just in capital cases, but in all cases, not to allow expediency to trump full and fair litigation of the issues.

### Defense Expert Access to Evidence

The appellant contends in AOE IX that the refusal of the military judge to allow the defense experts to conduct independent testing of the physical evidence admitted at trial was error and denied the appellant equal access to the evidence. This, claims the appellant, gave the prosecution an unfair advantage and violated his right to equal opportunity to gather and present evidence under Article 46, UCMJ. Appellant's Brief at 1–2 (citing the Record of Trial at 247–48, 369, 372, 374–76, 379). The appellant also contends in AOE CIII that the military judge erred in allowing Government experts to testify regarding evidence to which defense experts were denied access.

The initial defense request for access to the physical evidence for defense expert testing was denied by the trial counsel. During an unrecorded R.C.M. 802 conference, the defense sought relief from the Government's refusal to provide the evidence for independent testing by defense experts. The defense also submitted a written motion specifically referring to the Government's DNA evidence, fiber evidence, firearm evidence, fingerprint evidence, questioned document evidence, and serology evidence. *See* AE CXX. The military judge, in spite of the CA's grant of defense expert assistance, stated he did not believe the defense was entitled to any expert assistance and denied the defense request to order the Government to allow the defense experts to conduct independent retesting absent demonstration by the defense that there was some flaw in the Government's testing.

During an unrecorded R.C.M. 802 conference, the defense informed the military judge that the defense team in the companion case of *United States v. Parker* had been provided with the actual evidence for retesting, to which the military judge suggested that the defense obtain the results of the *Parker* defense team's experts instead. There was no discussion of the obvious conflict raised by such a suggestion between accused who have clearly competing interests at trial.

The defense later litigated the issue on the record. Record at 368; AEs CXXXIX–CXLI. The military judge reiterated his ruling that he would not "require the government to submit this evidence to [the defense] experts for further testing, absent

some evidence that there were faulty testing procedures used." *Id.* at 368. The defense counsel informed the military judge, not surprisingly, that the *Parker* defense team had refused to provide their experts' reports. The military judge ultimately replied, "Well, my ruling remains the same with regards to requiring the government to turn that evidence, the real evidence, over to [the defense] experts." *Id.* at 369. The defense counsel then emphasized to the military judge that the defense experts are "going to be able to provide very little assistance, if any at all, without this evidence." *Id.* The military judge subsequently directed the Government to send relevant original documents to the defense's questioned document examiner. *Id.* at 371. He then reiterated, "I've already ruled that I'm not going to require that the evidence be retested, except as it relates to providing the questioned document examiner with the original." *Id.* at 372. The military judge then stated, "I'm going to require the government to provide their ballistic experts with the test results— or rather the real evidence to have it retested." *Id.* However, later the military judge referred to the government ballistics experts meeting with the defense ballistics experts "face to face with results in hand." *Id.* at 376.

After calling a counsel from the *Parker* defense team to the stand to ask why the test results were being withheld, the military judge again reiterated that he would not make the evidence available to defense experts in the appellant's case. The discussion of the defense's motion concluded with the trial counsel noting, "If all the defense experts are going to be here, they can go ahead and look at the physical evidence that's going to be sitting over at NIS." *Id.* at 379. The military judge replied, "I understand they can look at it, but they can't touch it." *Id.*

■ We review the military judge's ruling on a discovery request under an abuse of discretion standard. *United States v. Morris,* 52 M.J. 193, 197 (C.A.A.F.1999). We reverse only if "the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law." *United States v. Sullivan,* 42 M.J. 360,

363 (C.A.A.F.1995)(citing STEPHEN ALAN CHILDRESS & MARTHA S. DAVIS, 2 FEDERAL STANDARDS OF REVIEW § 11.10 at 11–41 (2d ed.1992)). Where we find error in the military judge's denial of discovery, constitutional due process rights are affected. *United States v. Kreutzer,* 61 M.J. 293, 298 (C.A.A.F. 2005). Such error must be subjected to a harmless error analysis, using a beyond a reasonable doubt standard. *Id.* (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and *United States v. Sidwell,* 51 M.J. 262, 265 (C.A.A.F.1999)).

■ Article 46 of the UCMJ provides, in part, that the "trial counsel, defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence. . . ." 10 U.S.C. § 846. "Under Article 46, the defense is entitled to equal access to all evidence, whether or not it is apparently exculpatory." *United States v. Garries,* 22 M.J. 288, 293 (C.M.A.1986). We agree with the appellant that "[t]he military criminal justice system contains much broader rights of discovery than is available under the Constitution or in most civilian jurisdictions." *United States v. Adens,* 56 M.J. 724, 731 (Army Ct.Crim.App.2002)(citing *United States v. Eshalomi,* 23 M.J. 12, 24 (C.M.A. 1986) and *United States v. Enloe,* 35 C.M.R. 228, 230, 1965 WL 4655 (C.M.A.1965)).

The federal courts have ruled that the Constitution requires that the defense be allowed to perform independent testing of physical evidence. "[M]ost courts find that a denial of the right to retest is a violation of fundamental fairness. . . ." Jean Montoya, *A Theory of Compulsory Process Clause Discovery Rights,* 70 IND. L.J. 845, 883 (1995); *see generally Warren v. State,* 292 Ala. 71, 288 So.2d 826 (1973), and cases cited therein; *see also McNutt v. Superior Court,* 133 Ariz. 7, 648 P.2d 122, 124 (1982). For example, the United States Court of Appeals for the Fifth Circuit has held, "Fundamental fairness is violated when a criminal defendant . . . is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion." *Barnard*

*v. Henderson,* 514 F.2d 744, 746 (5th Cir. 1975).

Indeed, in a case where our superior court affirmed the military judge's denial of a defense request to have the Government retest evidence, they noted that the evidence had been made available to the defense for independent testing by defense experts. *United States v. Robinson,* 39 M.J. 88, 90 (C.M.A.1994)(Sullivan, C.J., concurring). In *United States v. Mosley,* 42 M.J. 300 (C.A.A.F.1995), where the military judge had abated proceedings after the CA refused his order granting the appellant's request for retesting of a urine sample, our superior court determined that the lower court had erred in overturning the military judge by applying an incorrect standard to the issue. *Id.* at 303. The appellant had presented evidence that further testing of the urine sample could show whether cocaine had been placed directly into the sample after it had been collected, and the judge had agreed, on the basis of fundamental fairness, relevance, and minimal burden on the Government. The intermediate court reversed, stating that the appellant had failed to show necessity under R.C.M. 703(f)(1) and *Garries. Id.*

 In the case at bar, the appellant did not ask the Government to retest any of the physical evidence. Nor did the request amount to a request for expert assistance, as the CA had already provided the experts needed to conduct the examination and testing of the evidence. The defense merely requested access to the evidence equal to that of the Government. The military judge erroneously held the appellant to an incorrect standard, requiring that the defense show some fault or error in the Government's testing before he would allow access to the evidence. The military judge's error was clear and highlighted by the standing objection of the trial defense counsel. *See, Garries,* 22 M.J. at 292–93 (holding even where the defense conceded the scientific validity of the tests, under Article 46, UCMJ, "the defense is entitled to equal access to all evidence, whether or not it is apparently exculpatory.").

The trial defense counsel made the following standing objection before the Government introduced the expert witness testimony:

> Sir, we would like to raise at this time a standing objection to any testimony presented by any forensic expert on VI Amendment grounds, specifically since we have been denied access to the evidence. Our forensic experts have been denied access to the evidence and we have been unable to have our forensic experts effectively assist us, and in turn then, we're not able to effectively represent Lance Corporal Walker. With regard to each of the government's forensic experts who are going to be testifying, I guess, serology, blood spatter, fiber, and firearms, we would like to raise that standing objection at this time so we don't have to continually address that as we have done up to this point.

Record at 1299.

During his closing argument, the trial counsel emphasized the Government's scientific evidence concerning the murder of LCpl James. *Id.* at 1681. While conceding that "there were no eyewitnesses" to LCpl James's murder, the trial counsel argued that the "scientific and circumstantial forensic evidence is overwhelming. It leaves no room for the accused to wiggle out of." *Id.* at 1862.

We reject the Government's argument that the military judge did not abuse his discretion by denying the defense the opportunity to examine the forensic evidence because further testing was not material to the appellant's defense. The forensic evidence was material and relevant to the case and the defense experts should have been afforded equal access to the physical evidence, absent some showing by the Government as to why that could not or should not be allowed. In this case, there was no such showing. We also agree with the appellant that the Government expert witnesses should not have been permitted to testify in light of the erroneous ruling denying their experts equal access to the evidence. *Garries,* 22 M.J. at 293.

Having found error, we must assess whether the error was harmless beyond a

reasonable doubt. *Kreutzer*, 61 M.J. at 298. The Government argues that any error occasioned by the military judge's errant ruling was harmless beyond a reasonable doubt, citing the overwhelming circumstantial evidence against the appellant; claiming that the forensic evidence was not central to the Government's case and was merely redundant corroboration of lay witness testimony; and the fact that the appellant's defense did not rely upon the Government's forensic evidence.

To affirm the impacted findings we must conclude that the testimony of the Government experts regarding the physical evidence introduced at trial was of minimal or no consequence in light of the testimony of the other Government witnesses. As we noted earlier, the trial defense counsel conceded in his opening statement to the members that the appellant and his vehicle were at the scene of both crimes. Even so, in every case, but most certainly in a death penalty case, we must look very closely at the potential impact that the error may have had on the deliberations of the members.

■ As to the offenses involving LCpl Page, specifically the conspiracy to commit assault, robbery, and premeditated murder, which remains viable in spite of our earlier finding with regard to the robbery and premeditated murder charges, we can easily determine that this error was harmless beyond a reasonable doubt. The evidence of the appellant's participation in planning the use of the loaded shotguns to assault a victim of their choosing is overwhelming. The Government's case was based almost entirely on eye witness testimony and circumstantial evidence corroborating that testimony and placing the appellant at the scene of the conspiracy and the subsequent killing of LCpl Page. The forensic evidence had little, if any, impact on the findings with regard to the conspiracy to assault, rob, and murder LCpl Page. We focus, then, on the impact that the military judge's error in denying defense experts access to the evidence may have had on the findings of guilty to the conspiracy to assault, kidnap and murder LCpl James; the kidnapping of LCpl James; and the premeditated murder of LCpl James.

■ Considered as a whole, and even under the heightened scrutiny afforded in a death penalty case, the circumstantial evidence of the appellant's guilt to these offenses was overwhelming. The appellant had a clear motive to murder the victim, LCpl James, who was abusing Vicky James, the appellant's paramour. Motive itself, however, is not sufficient to support a conviction. LCpl James was shown to have a temper and a violent nature at times. The appellant was clearly afraid of him, knowing the larger LCpl James had threatened to kill his wife if she was cheating on him. This state of fear could provide a plausible explanation as to why the appellant bought a shotgun and had it modified for ease of use, keeping it in the trunk of his car; however, the appellant's statements before and following the killing indicate premeditation, not self-defense. This is further supported by the appellant's statements suggesting that the shotgun was intended for possible use against the victim. The appellant had also threatened to kill LCpl James. Finally, according to Vicky James, the appellant brought LCpl Parker to the James' household on the evening of the murder and told her that her husband was going to "get done."

Vicky James testified that the appellant, LCpl Parker, and LCpl James departed the James' residence together in two vehicles on the night of the murder. We know, based on other witnesses, that the appellant's vehicle, with two black male occupants, was seen departing the area of the murder scene at a high rate of speed immediately after witnesses heard a gunshot. Vicky James also testified that the appellant told her he was there and saw her husband killed.

What we do not know from the witnesses, as the trial counsel conceded in argument, was what exactly transpired at the scene of the crime or who was actually present. This is where the expert testimony became a factor in the trial. Testimony suggested that, of the three people who left the residence that evening, only the victim could have been the source of the blood on the appellant's vehicle. Testimony also suggested that fibers found in the appellant's vehicle and on the victim's

sweatpants were compatible. Testimony suggested that the wadding found in the victim's body matched the wadding found in the shells found with the appellant's shotgun. Testimony suggested that the lead composition of the pellets from the victim matched the pellets from shells found with the appellant's shotgun. All but the last expert's testimony went virtually unrebutted, as the appellant had no independent testing of his own upon which to rely.

Again, according to Vicky James, the appellant called her later that evening and informed her that LCpl James had been killed and that he had seen it done. Buttressing this testimony was the physical evidence that the appellant was the owner of a shotgun matching the description of the one he had provided to LCpl Adams during the earlier events leading up to the murder of LCpl Page. This testimony is also corroborated by that of Desiree Tensley, who also stated that the appellant telephoned her and told her that it had been done, referring to an earlier telephone conversation where the appellant had indicated harm would come to LCpl James that evening.

The defense attempted to show that Vicky James had an equal or greater motive to kill her husband than did the appellant. Vicky James' testimony must be considered with the understanding that, if she was involved in the murder, she may have been lying on the stand. This court is not suggesting that this is, in fact, what occurred, simply pointing out that, when considering whether the evidence proves guilt beyond a reasonable doubt, alternative theories must be given their due, if supported by the evidence. In this case, it was fair argument for the defense to put forward that Vicky James could have been involved in the murder with another, perhaps LCpl Parker, and covered her participation by inserting the appellant in her place in the actual events. The appellant's actions and words, however, both before and after the killing, leave no doubt regarding his guilt, even without considering the forensic evidence that places him and his vehicle at the scene of the crime.

We also disagree with the appellant's characterization of the case against him as rising or falling solely on the testimony of Vicky James. We consider the testimony of LCpl McDonald, the appellant's barracks roommate, to whom the appellant admitted his ongoing affair with Vicky James (Record at 864–65), that he disliked the way LCpl James treated Vicky (Record at 865), and that he had purchased a shotgun which he kept in his automobile (Record at 865–66). The appellant told McDonald about an earlier incident of abuse between LCpl James and Vicky James during which the appellant opened his trunk and reached for his shotgun, but was dissuaded from producing it when Vikki James indicated "no" nonverbally by shaking her head (Record at 866). The appellant also told LCpl McDonald that he and LCpl James were on bad terms and that he (the appellant) would "take care of James." Record at 866.

In February of 1992, the appellant told LCpl McDonald that, in order to "take care of James," he would lure James away from his home by telling him there was a party taking place at the barracks. On 30 March 1992, the date of the James murder, LCpl McDonald witnessed the appellant leave the barracks around 1800 with LCpl Parker and overheard them discussing going to LCpl Neikirk's home. Later that night, LCpl McDonald testified that he received a telephone call from the appellant in which the appellant told him, "It's done!" When asked what he was talking about, the appellant replied, "Rock–a–Bye, Baby" in apparent reference to a scene from a video game in which these same words were uttered by a woman who had just shot a man in the head. The appellant was sober when he made these comments.

The Government also presented the testimony of LCpl Hayes, who was asked to hold the appellant's shotgun in his car trunk after the LCpl Page murder, and who testified that the appellant retrieved it from him later that same day. Record at 905–07. LCpl Brown, a co-accused in regard to the LCpl Page murder, testified that he witnessed the appellant and LCpl Parker looking for black shirts on the evening of 30 March 1992 (the night of the LCpl James murder). *Id.* at 963. He also testified about the appellant

stating to him, "a person could live real good off of $50,000," an apparent reference to LCpl James' military life insurance proceeds. *Id.* at 962. LCpl Brown further testified that both the appellant and LCpl Parker left the barracks room indicating they were going to LCpl Neikirk's house to look at a handgun. *Id.* at 965.

Desiree Tensley testified that the appellant told her directly about the affair he was having with Vicky James, and that he wanted to kill LCpl James so the two of them could be together. *Id.* at 1101–02. The appellant told Ms. Tensley that Vicky James was aware of his intentions. He also told her that the murder had to occur that week because he was going away. The appellant further mentioned he "had a friend who would do anything for him." *Id.* at 1103. Ms. Tensley stated that, on 30 March 1992, while she was talking with Vicky James on the phone, the appellant got on the line and told her "its going to happen tonight." *Id.* at 1104–05. She stated that, later that night, the appellant called her from a friend's house in a nervous state and exclaimed, "Desiree, its done." *Id.* at 1105. He then asked Ms. Tensley to come and get him [she refused], and also asked her to get in touch with Vicky James to tell her he loved her. *Id.* at 1105–06.

LCpl Neikirk, testified that the appellant and LCpl Parker came by his house at approximately 1745 on 30 March 1992. During their visit, the appellant showed LCpl Neikirk his loaded shotgun which was in the trunk of the appellant's car. The appellant and LCpl Parker left his house around 2015. That same day, he overheard the appellant state he was going to "do James before James did him." *Id.* at 1126–28.

Mr. Phillip A. Sartor testified that the appellant and LCpl Parker also approached him at his front door on the night of 30 March 1992 about leaving the appellant's car at his home. Mr. Sartor ultimately agreed. *Id.* at 1228. The appellant asked to use the telephone and took it into the Sartor's bathroom, apparently for privacy. After leaving the bathroom, the appellant asked for a rag from Mr. Sartor, then went outside and began to wipe down his car. He then gave his keys to Mrs. Sartor. As Mr. Sartor backed his vehicle up to give the appellant and LCpl Parker a ride back to the base in his car, the appellant asked him to stop, retrieved his car keys from Mrs. Sartor, opened his trunk and began scrubbing down the bumper very hard again with a rag. He finished and gave the keys back to Mrs. Sartor. As they were being driven back to the base in Mr. Sartor's vehicle, the appellant stated to Mr. Sartor, "if anybody asks, we've [the appellant and LCpl Parker] been with you [Sartor] all day," or words to that effect. *Id.* at 1232–33.

Under the circumstances of this case, we are convinced that the error was harmless beyond a reasonable doubt with regard to the findings of guilty of conspiracy to kidnap and murder LCpl James, kidnapping of LCpl James, and the premeditated murder of LCpl James.

The appellant would have us believe that it is only with the binding glue of the forensic evidence, tying the appellant's shotgun to the crime, the victim's blood type on the appellant's vehicle bumper, and the relation of the shotgun shells and pellets to the ammunition found in the appellant's storage room that the Government's case becomes so overwhelming that all other rational explanations for the murder fade. We disagree.

The appellant makes no suggestion whatsoever as to how retesting of the physical evidence in this case would have helped the appellant overcome the overwhelming evidence of his guilt of both of these offenses. *Compare United States v. McAllister (McAllister I)*, 55 M.J. 270, 276 (C.A.A.F.2001)(holding where physical evidence (DNA) was the clear lynchpin of the prosecution's case, and rapid evolution in polymerase (PCR) testing processes left two tests for additional genetic systems that might exclude appellant as a suspect obviously incomplete, remand was appropriate), *later proceeding at* 64 M.J. 248 (C.A.A.F.2007)(*McAllister II*). The appellant does not suggest any theory as to how defense expert testing of the physical evidence could have produced results that were either exculpatory or even helpful to the appellant at trial, or could have reasonably altered the findings in this case.

All of the evidence in this case was forensically tested by qualified Government experts. There was no defense request for retesting of the evidence by the Government. There is no suggestion that the original testing was faulty or erroneous in a manner truly significant to the findings in this case.[8] Also, the physical evidence was clearly collateral to the case as a whole. No prejudice has been demonstrated, and, even though "death is different," not even speculation has been offered as to how such retesting might have produced results that could have altered the members' findings. Certainly, a death penalty case mandates a unique degree of heightened scrutiny at all levels. But even in a death penalty case, judicial errors must be subjected to a harmless error analysis, and we should not reverse a conviction where no material prejudice is demonstrated or even vaguely apparent. *See* Art. 59, UCMJ; *Kreutzer*, 61 M.J. at 298 (even errors impacting upon constitutional rights may be discounted if harmless beyond a reasonable doubt).

This testimony and evidence independently and compellingly corroborates the testimony of Vicky James, establishes a clear motive for the appellant to have murdered LCpl James, places him in possession of the murder weapon, and unequivocally places him and his automobile at the scene of the crime. The appellant's extreme consciousness of guilt is manifest in his subsequent actions aimed at covering up the offense (e.g., wiping blood off his automobile bumper) and trying to create an alibi for himself after the fact. The members could easily have found the appellant guilty of the LCpl James murder beyond a reasonable doubt based upon this overwhelming evidence of his complicity and involvement. Accordingly, the appellant cannot demonstrate prejudice from his inability to gain access to the physical evidence in this case. The military judge's improper denial of access was, therefore, harmless beyond a reasonable doubt.

This death penalty case concluded in 1992. Over fifteen years later there is not a single affidavit in the record from any defense expert or other witness presenting a plausible theory as to how the Government's experts "got it wrong" as regards their testing of the physical evidence.[9] We agree with the Government's position that the denial of retesting, though clearly improper, was harmless beyond a reasonable doubt because "1) the circumstantial evidence against Appellant was overwhelming; 2) the forensic evidence was not central to the Government's case and was merely redundant of lay witness testimony; and 3) Appellant's defense did not rely upon the Government's forensic evidence." Answer on Behalf of the Government (Part I) of 24 Mar 2006 at 58; *see generally United States v. Clark*, 62 M.J. 195, 200–01 (C.A.A.F.2005)(recommending four-part examination to determine if error prejudiced court-martial findings, looking at: 1) the strength of the Government's case, 2) the strength of the defense case, 3) the materiality of the evidence in question, and 4) the quality of the evidence in question.)

### Lack of a Spill–Over Instruction

The appellant also alleges in AOE XII that the military judge erred by failing to deliver a spill-over instruction despite previously concluding that such an instruction was necessary as an alternative to severing the charges. The defense made a motion to sever the offenses related to the two murders. Record at 107; AE XXXVI. The military judge denied the motion, indicating that he would instead provide a limiting instruction directing the members that, in the event they found the accused guilty of one of the offenses involved in either murder, they

---

8. The defense cites an alleged discrepancy in the conclusions reached by the Government's lead composition expert regarding batch sourcing of buckshot pellets to support their position. However, they fail to recognize that this minor dispute concerning his overall analysis was essentially irrelevant to the case as a whole, or to the expert's ultimate findings. The evidence clearly established that LCpl James was murdered with .000 buckshot fired from the appellant's shotgun, and that .000 buckshot rounds "consistent with" those used in the murder were found in, or seized with, the appellant's shotgun.

9. Though defense experts representing the appellant's co-accused, LCpl Parker, were apparently given access to the physical evidence for retesting, nothing from those particular retests has been submitted in support of this claim of prejudice.

could not allow that finding to "spill over and inferentially cause them to conclude beyond a reasonable doubt that he is guilty of the other." Record at 108. The military judge stated that the two murder charges were to be treated as unrelated offenses and that he would so instruct the members. *Id.* The military judge later reiterated his position, stating:

> The issue is should these offenses be severed and it is this court's opinion that they should not, that all known charges should be tried, again with a limiting instruction to the members that they are not to consider any offense that's related to one of these murders to in any way be related to the other absent some evidence, government evidence, that might link them up.

*Id.* at 110. Despite his firm position regarding the instruction, it was not given and no defense objection was made to the instructions that were given. *Id.* at 1710–35, 2012–19.

 The failure on the part of the trial defense counsel to object to the military judge's omission of an instruction waives the issue on appeal absent a finding of plain error. *United States v. Guthrie,* 53 M.J. 103, 106 (C.A.A.F.2000). To establish plain error, the appellant must show that: "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Tyndale,* 56 M.J. 209, 217 (C.A.A.F.2001)(citing *United States v. Finster,* 51 M.J. 185, 187 (C.A.A.F.1999); *United States v. Powell,* 49 M.J. 460, 463–65 (C.A.A.F.1998)). Once the appellant has met the burden of demonstrating plain error, the burden shifts to the Government to show that the error was not prejudicial. *Powell,* 49 M.J. at 464–65.

 In death penalty cases, the military judge's failure to give appropriate instructions *sua sponte* gives rise to close scrutiny on appeal. In *United States v. Thomas,* 46 M.J. 311, 316 (C.A.A.F.1997), the court held that the military judge's erroneous instructions, to which the defense did not object, undermined "confidence in the reliability" of the sentence because they created "an intolerable risk that this ultimate sanction was erroneously imposed." *See United States v.*

*Simoy,* 50 M.J. 1 (C.A.A.F.1998). We agree with the assertion by the appellant that there may be instructional errors that would ordinarily be deemed waived in non-capital cases, but will nevertheless warrant relief in death penalty cases. *See Loving,* 41 M.J. at 278 ("there is a heightened need for reliability in capital punishment cases"), *aff'd,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

 We do not quibble with the military judge's decision to deny the motion to sever. Nor do we quibble with the military judge's determination that, under the facts of the case before him, he would instruct the members carefully to keep the offenses separate, applying only the evidence before them as it related to each offense and guarding against allowing any inference of guilt from one finding determination to another. The military judge then clearly erred by failing to provide a spill-over instruction to the members. Having determined the instruction to be necessary and appropriate, the military judge was bound to give the instruction or suffer error.

The issue is whether that error was plain and obvious, thus demanding relief in the absence of any Government proof that no prejudice was suffered. The appellant urges this court to consider the facts of the instant case as analogous to those found in *United States v. Myers,* 51 M.J. 570 (N.M.Ct.Crim. App.1999). LCpl Myers was accused of raping and anally sodomizing two different victims on two separate occasions. We noted that both incidents involved what has been described as acquaintance rape scenarios, and the primary issue in each instance was whether or not the alleged victims had consented to the sexual acts they engaged in with the appellant. The defense moved to sever the trial on the two incidents. The military judge denied the motion. Later, before a different military judge, the defense again moved to sever. The second military judge also denied the motion, but stated, "I obviously will be happy to give an appropriate instruction to the jury in connection with the danger of spill-over." *Id.* at 577. During discussion of the proposed findings instructions, however, the military judge reversed his earlier decision and declined to

provide the instruction. The military judge in that case stated as his rationale that, under Military Rule of Evidence 413, Manual for Courts-Martial, United States (1995 ed.), "no spill-over instruction should be given at all because the Government can argue from the offenses involving Corporal [D] that they tend to show guilt on the part of the accused as to sexual assaults perpetrated against Ms. [H] and vice versa." *Myers,* 51 M.J. at 578. This Court held that "the military judge abused his discretion in refusing to give the defense requested spill-over instruction to the members prior to their deliberations on findings." *Id.*

In *Myers,* this court found that trials where separate offenses are joined together raise the very real possibility that "juries will use the evidence of one of the crimes charged to infer a criminal disposition on the part of an accused with regard to other crime(s) charged." *Id.* at 579. The appellant also recounts for us in brief the prescient quote from Judge Learned Hand contained in our *Myers* decision:

> [t]here is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all.

*Id.* (quoting *United States v. Lotsch,* 102 F.2d 35, 36 (2d Cir.1939)). This Court then cautioned that "[i]n military practice, concerns arising from joinder of offenses must be vigilantly addressed by all practitioners, as severance is rarely granted." *Id.* We reiterate today what we stated in *Myers,* that while we are comfortable with the assumption that properly formulated instructions are sufficient to prevent members from cumulating evidence, that is true "only to the extent that such instructions are actually given." *Id.*

In *Myers,* however, the Government's cases regarding each separate alleged sexual assault victim, standing alone, "were weak and riddled with significant discrepancies." *Id.* at 581. That is not the case here. There is tremendous, compelling and independent evidence of guilt on each set of offenses relating to both the LCpl Page and LCpl James murders. The danger of improper spillover in this case was clearly minimized by this undeniable reality of both the quantum and quality of evidence on each separate set of offenses. We are unable to specifically cite to anything in the record which suggests that improper spillover of evidence in this case actually occurred and impacted the findings. Additionally, in *Myers,* the prosecution effectively solicited improper spillover of evidence through various statements made in their closing argument on findings, which focused on the similarities between the two offenses. The *Myers* prosecutor improperly invited the members to compare the likelihood and/or probability that two separate alleged victims would make up such similar allegations, thereby soliciting the members to apply "where there's smoke there must be fire" logic and to ignore the weaknesses that clearly surrounded each allegation standing alone. *Id.* at 581–82, n. 22. No such findings arguments were made in this case.

We note that there was no defense request for a spill-over instruction and no objection was made to the findings instructions as given. Record at 1710–35, 2012–19. This mitigates strongly against a finding of plain error. Additionally, no plain error can be established because no material prejudice can be shown from their having been no spill-over instruction in this case. The appellant provides no authority in support of the argument that he was materially prejudiced by this failure.

Finally, we note that the trial counsel addressed the offenses separately in argument, clearly detailing the evidence presented to prove each offense independently of the others. Accordingly, because no material prejudice to the appellant can be demonstrated, the military judge's failure to provide a spill-over instruction did not constitute plain error.

### Incomplete/Nonverbatim Record of Trial

During the course of the appellant's trial, the military judge made extensive use of R.C.M. 802 conferences. In AOE LXV, the appellant alleges that the record of trial is incomplete or, in the alternative, is nonverba-

tim because of the extensive use of conferences held between the military judge and counsel under R.C.M. 802. We have a deeper concern regarding the military judge's use of these conferences founded in: (1) the appellant's right to be present at trial under R.C.M. 804; Article 39, UCMJ; the due process clause of the Fifth Amendment of the Constitution; and the confrontation clause of the Sixth Amendment; and (2) the appellant's right to a public trial under R.C.M. 806 and the Sixth Amendment.

The appellant was arraigned on 29 September 1992. The military judge noted that he had held a brief R.C.M. 802 conference in the appellant's presence immediately before going on the record to determine the purpose of the Article 39(a) session. Record at 8. At an Article 39(a) session on 5 October 1992, the defense conducted voir dire of the military judge and requested trial by military judge alone in spite of the referral of the case as capital. The military judge denied the request and set dates for motions and trial.

At Article 39(a) sessions conducted on 18 and 19 November 1992, the detailed defense counsel raised a conflict of interest issue arising out of his reassignment from defense counsel duties to review officer duties, alleging that the review work was consistently interfering with his ability to represent the appellant. During the course of the session, the military judge held an R.C.M. 802 conference to discuss an upcoming motion by the defense for an *ex parte* motion session on the issue of defense expert assistance. *Id.* at 58. The military judge then considered, and denied, the motion on the record. *Id.* at 63. The military judge ruled on several other motions and revised the trial schedule.

A different military judge once again called the court to order on 17 December 1992. The appellant was not present and his detailed defense counsel stated that the appellant had waived his right to be present for the purposes of the Article 39(a) session. *Id.* at 80. The individual military counsel and the detailed defense counsel placed concerns on the record regarding the possibility that privileged material and attorney work product had been compromised by the exchange by command personnel of the detailed defense counsel's computer for a different model.

On 26, 27, and 28 January 1993, the original military judge called the court to order once again. The parties litigated a number of motions, without reference to any R.C.M. 802 conferences.

The next Article 39(a) session was held on 29 March 1993. The military judge considered the appellant's arguments for compelling the Government to provide funding for a variety of expert assistants. The appellant's request for a defense investigator, either from a Government law enforcement agency or through funding of a civilian investigator, was raised in a written motion. AE LXXXIII; AE XCII. The remaining requests for expert assistants were raised orally, but supported by written requests submitted to, and denied by, the CA. These included: a forensic psychiatrist, AE LXXXV; an expert in DNA testing and forensic serology, AE LXXXVI; a forensic firearms expert, AE LXXXVII; a DNA expert, AE LXXXVIII; a forensic fiber analysis expert, AE LXXXIX; a questioned document examiner, AE XC; and a forensic fingerprint expert, AE XCI.

The military judge, after taking evidence and hearing argument, denied the appellant's motion as to all of the expert assistants, except for granting the request for a forensic psychiatrist and for a defense investigator. Record at 239. The military judge ruled specifically that the experts would be provided from Government sources and denied the appellant's request to compel funding for civilian experts.

On 8 April 1993, the defense filed a motion to reconsider the military judge's ruling denying the defense requested expert assistants in DNA testing, forensic fiber analysis, forensic firearms analysis, forensic fingerprint analysis, questioned document analysis, and forensic serology analysis. AE CII.

On 13 April 1993, in a telephonic R.C.M. 802 conference between the military judge, trial counsel, and defense counsel, the military judge denied the appellant's motion requesting reconsideration of the motion to compel the Government to provide funding

for defense expert investigative assistance that had been denied on the record on 30 March 1993. Record at 244–45. The record of trial contains no details regarding the arguments of counsel, any evidence that may have been discussed, or any basis for the military judge's ruling.

On 28 April 1993, in a telephonic R.C.M. 802 conference between the military judge, trial counsel, and defense counsel, the military judge informed the parties that he was granting just one week of the appellant's requested continuance from 18 May until sometime in June. *Id.* at 245.

On 30 April 1993, the appellant filed an addendum to the motion for reconsideration filed on 8 April and denied by the military judge on 13 April. *Id.;* AE CIV. On 4 May 1993, the staff judge advocate apparently granted some portion of the appellant's requests for funding for expert assistants, and on 13 and 24 May 2003, the Government provided substitute expert assistants for certain of the requested expert assistants. Record at 246. The record of trial contains no specific information as to which of the experts were funded, which were provided through Government substitutes, and which were denied.

On 6 May 1993, in a telephonic R.C.M. 802 conference between the military judge, trial counsel, and defense counsel, the military judge discussed the appellant's motion for a continuance into June. The military judge granted the motion. There is nothing in the record of trial memorializing the specifics of the discussion, evidence considered, or the basis of the military judge's ruling. *Id.* at 245.

On 11 May 1993, in a telephonic R.C.M. 802 conference between the military judge, trial counsel, and defense counsel, the trial counsel requested reconsideration of the military judge's ruling at the prior R.C.M. 802 conference granting the defense motion to continue the trial until 14 June 2003. The trial counsel cited case scheduling conflicts with the companion case of *United States v. Parker.* The military judge denied the reconsideration request and indicated that he would hold counsel to the trial schedule of 8 June 2003 to begin hearing motions and 14

June 2003 to begin taking evidence. Again, there is no further detail provided in the record of trial regarding the arguments of counsel, evidence, and findings of the military judge that formed the basis for the military judge's ruling. *Id.* at 245–46.

On 24 May 1993, in a telephonic R.C.M. 802 conference between the military judge, trial counsel, and defense counsel, the defense counsel requested that the military judge bifurcate the trial, allowing a delay between findings and sentencing occasioned by the non-availability of the defense mitigation specialist. The defense counsel cited to an affidavit of the specialist attached to an unidentified written motion scheduled to be litigated in June. The military judge denied the defense request. There were no additional details regarding argument of counsel, evidence, or findings of the military judge included in the record of trial. The defense also raised concerns with the adequacy of the substitute expert assistants provided by the Government in lieu of the defense-requested assistants. The military judge stated that he continued to believe that the defense was not entitled to experts of their own choosing. The military judge then encouraged the defense to raise the motions during the motions session in June. *Id.* at 246–47.

On 2 June 1993, in a telephonic conference between the military judge, trial counsel, and defense counsel, the military judge granted the appellant's request to be removed from pretrial confinement and brought to the defense counsel's office for trial preparation. The defense counsel also raised a motion alleging prosecutorial misconduct because the Government refused to provide access to the physical evidence to the defense experts, providing instead only the reports of testing on the physical evidence. The military judge denied the motion. *Id.* at 247–48.

The defense counsel argued that the physical evidence had been made available to the defense team in the companion case of *United States v. Parker,* and argued that they should have equal access to the evidence. The military judge encouraged the defense counsel to contact the *Parker* defense team

and request the reports of testing conducted by the *Parker* defense experts.[10] *Id.* at 248.

During this same R.C.M. 802 conference, the military judge ruled favorably on a defense motion to exclude armed military police from the courtroom and on a defense motion to order the Government to make available a journalist for interview by the defense with regard to sources of exculpatory information emanating from an article he had written. *Id.* at 248–49.

On 9 June 1993, the military judge called the court to order. The prior Article 39(a) session had ended 71 days earlier, on 30 March 1993. The trial counsel read into the record of trial a summary of events that had occurred relating to the trial, including the foregoing R.C.M. 802 conferences held between sessions of the court. Record at 244–49. The defense lodged no objection and, when asked, had no corrections to the trial counsel's summary of the various R.C.M. 802 conferences. Thereafter, the military judge began hearing motions, starting with the defense motion for expert assistants. AE CII. The military judge stated that this motion had "already been litigated by the court." Record at 251. The military judge then referenced one of the prior R.C.M. 802 conferences regarding availability of a defense witness and a motion for continuance filed by the defense and stated that he had ruled granting the defense motion to the extent that he would allow one or two days continuance during the trial if the schedule of the witness compelled that action. He finished by stating "my earlier ruling stands." *Id.* at 252.

The military judge next considered the appellant's motion requesting reconsideration of the military judge's denial of all but the forensic psychiatry expert assistant, referring to AE CIV. *Id.* The military judge indicated that this motion was mooted by the Government providing all of the expert assistants requested by the defense. *Id.* The military judge also noted that a defense motion for additional funding for the mitigation expert had been mooted by the Government's

agreement to provide the additional funding. The military judge then stated that "the first motion that apparently we need to litigate" was the defense motion to suppress the results of a search of the appellant's automobile. *Id.* at 253–54.

Prior to 1984, military judges often utilized pretrial conferences to discuss issues that were administrative in nature or that could be resolved by agreement of the parties. R.C.M. 802, Drafters' Analysis. The rule codified in the 1984 MANUAL FOR COURTS-MARTIAL adopted that common practice and established uniform rules for its employment during trial. *Id.* The rule reads, in part, that "the military judge may, upon request of the parties or *sua sponte*, order one or more conferences with the parties to consider such matters as will promote a fair and expeditious trial." R.C.M. 802(a). The Discussion section clarifies this general rule by stating that "[t]he purpose of such conference is to inform the military judge of anticipated issues and to expeditiously resolve matters on which the parties can agree, not to litigate or decide contested issues." R.C.M. 802, Discussion. To litigate issues, or to decide issues not subject to agreement between the parties, "would exceed, and hence be contrary to, the authority established under Article 39(a)" for such conferences. R.C.M. 802(a), Drafter's Analysis.

Article 39(a), UCMJ, allows the military judge to call sessions of the trial outside the hearing of the members to resolve those issues that are within his purview. It also requires these sessions to be made in the presence of the accused, the defense counsel, and trial counsel, and be made part of the record of trial. Art. 39(a), UCMJ.

This does not, however, address our critical concern with the use of R.C.M. 802 conferences in the instant case. Here, the military judge not only held discussions and reached agreement of the parties during these conferences, but he heard argument, considered evidence, and ruled on matters, all without making a record of the proceedings, ensuring that the appellant was pres-

---

**10.** There is no discussion of conflict of interest in one defense team making attorney work product available to a companion case defense team.

ent, or providing access to the proceedings to the public.

While the federal practice involving the use of pretrial conferences bears some similarity to the military practice of using R.C.M. 802 conferences, they are different in critical ways. The federal rules allow for the litigation of pretrial motions, as long as a record is made of the proceedings.[11] In *United States v. Coia*, 719 F.2d 1120 (11th Cir.1983), the judge litigated, in a pretrial conference, a motion to dismiss the Government's indictment for violation of the statute of limitations. Finding that Rule 17.1 of the Federal Rules is a codification of the court's inherent power to manage the litigation before it, the 11th Circuit held that Rule 17.1 is read in conjunction with Rules 12(a) & (b), which grant the defendant the right to make certain motions prior to trial, including specifically the insufficiency of an indictment due to a statute of limitations violation. *Id.* at 1123.

The Federal Rule is founded in the common law and Supreme Court precedent. In *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934),[12] the Supreme Court clarified the law regarding the defendant's right to be present at trial. Acknowledging that the right is not absolute, the Court held that "the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 107–08, 54 S.Ct. 330. In support of this holding, the Court noted that, in their prior holdings, the right to be present at trial bears a reasonably substantial relation to the defendant's opportunity to defend and that they had not provided relief in cases where the absent defendant's presence would have been of no use or meaning. *Id.* at 106–07, 54 S.Ct. 330. This does not mean that the right to be present at trial is subsumed by the right to confrontation. It applies to any stage of the trial where the defendant's presence and participation would be meaningful. *Id.* at 107, 54 S.Ct. 330.

A distinction can be drawn, however, between the defendant's right to be present during preliminary motion hearings and those involving the taking of evidence following empanelling of the jury or the introduction of pleas. The defendant's presence at preliminary motions stages may be, in some instances, waived, but may not be waived quite so easily during the trial itself. *Lewis v. United States*, 146 U.S. 370, 374–75, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). In the case at bar, in fact, the appellant waived his presence for an Article 39(a) session held on 17 December 1992, where the trial defense counsel raised concerns of a possible compromise of privileged material. There is no issue that the appellant was absent from any session of the trial where evidence on the merits was presented, nor was he absent at any time during sessions before the members. In fact, the members were not empanelled and pleas were not finally presented when the R.C.M. 802 conferences were held.

█ Any violation of the appellant's right to be present during a critical portion of the court-martial is subject to harmless error analysis. *Rushen v. Spain*, 464 U.S. 114, 119 n. 2, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). Only where the violation fundamentally undermines the fairness of the trial, and can therefore be considered a *structural error*, will automatic reversal result. *Id.*

An issue closely related to the appellant's right to be present at all stages of his trial is the public's right to be present at the criminal trial of a fellow citizen. The rationale for this fundamental right are plain and obvious, acting as the foundational protection against "star chamber" trials and back alley justice. The right to a public trial belongs to the appellant under the Sixth Amendment and to the public at large under the First Amendment. *United States v. Harvey*, 64 M.J. 13, 20 n. 26 (C.A.A.F.2006). The constitutional mandate that trials be open to the public has specific benefits for the appellant. *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81

---

11. "(f) Recording the Proceedings. All proceedings at a motion hearing, including any findings of fact and conclusions of law made orally by the court, must be recorded by a court reporter or a suitable recording device." FED.R.CRIM.P. 12.

12. Overruled on other grounds by *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

L.Ed.2d 31 (1984). First, the presence of the public ensures that the appellant is fairly dealt with and not unjustly condemned, and, second, the presence of interested spectators keeps the military judge and members " 'keenly alive to a sense of their responsibility and to the importance of their functions.' " *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (quoting *In re Oliver*, 333 U.S. 257, 270, n. 25, 68 S.Ct. 499, 92 L.Ed. 682 (1948), in turn quoting 1 T. Cooley, Constitutional Limitations 647 (8th ed.1927)).

The Supreme Court has held that a suppression hearing falls under those portions of the trial to which the full measure of the Sixth Amendment right to public trial guarantee applies. *Waller*, 467 U.S. at 46, 104 S.Ct. 2210. In so holding, the Court recognized the importance of the judge hearing testimony, viewing evidence, and considering the arguments of counsel. *Id.* In that case, the Court ordered a new suppression hearing to determine whether the outcome would be any different in a public forum, rather than set aside the verdict and order a new trial. *Id.* In the instant case, the military judge considered evidence and the arguments of counsel in deciding motions while out of the public eye and while the appellant was not present.

Even assuming, *arguendo*, that the appellant's absence from the R.C.M. 802 conferences and the lack of public access to the conferences were of no legal consequence, we must also address the thorny issue of whether the record of trial is complete and verbatim. In a case where the military judge held an unrecorded side-bar conference with counsel regarding the admissibility of evidence, our superior court has held that the omission of the side-bar was substantial, rendering the resulting record of trial nonverbatim. *United States v. Gray*, 7 M.J. 296, 298 (C.M.A. 1979). In *Gray*, after both parties had rested, the members asked a question regarding the manner in which the accused had been dressed during his identification from a lineup. The military judge held a side-bar conference to discuss whether or not to admit and publish to the members pictures of the lineup. The trial defense counsel objected to the admissibility of the pictures, just as he had done earlier in the trial. The military judge overruled the objection and published the admitted pictures to the members. The conference was not recorded in the record of trial. *Id.*

The appellant in *Gray* alleged on appeal that the omission of the conference from the transcript rendered the record of trial nonverbatim within the meaning of Article 54, UCMJ. The court agreed. *Id.* Article 54(a) provides that every general court-martial will keep a record of the proceedings for every case brought before it. This provision has consistently been interpreted to require the proceedings to be substantially verbatim. *Id.* (citing *United States v. Douglas*, 1 M.J. 354 (C.M.A.1976) (citations omitted)).

In agreeing with the appellant in *Gray*, the court noted that, although not every sidebar conference must be recorded verbatim, a conference "involving a ruling by the judge affecting rights of the accused at trial must be fully recorded if the transcript is to be verbatim." *Id.* (citing *United States v. Richardson*, 45 C.M.R. 157, 1972 WL 14146 (C.M.A.1972)). The court has also pointed out that the issue of concern where such conferences are omitted from the record is not the sufficiency of the record for purposes of appellate review, but rather "the statutory command regarding the type of record that must be made of courts-martial proceedings. 'Inclusion of the substance of a portion of the record of proceedings dealing with material matter is not a verbatim transcript of the record.' " *Id.* (quoting *United States v. Sturdivant*, 1 M.J. 256, 257 (C.M.A 1976)).

Addressing the issue of prejudice, or, rather, the Government's argument that the lack of prejudice rendered the error harmless, the court in *Gray* stated the substantial omission raised a presumption of prejudice which the Government must rebut. *Id.* This is so because it is the Government's obligation to prepare the verbatim transcript. In *Gray*, the Government failed to carry that burden.

■ The Government urges us to consider the issue waived by the appellant's failure to object at trial. We may not. We agree with the appellant that the requirement for a complete and substantially verbatim record

of trial is jurisdictional and cannot be waived by failure to object at trial. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F.2000). If the record of trial in this case is to support the sentence adjudged—death—it must be substantially verbatim. R.C.M. 1103(b)(2)(B).

In *United States v. Garcia*, 24 M.J. 518 (A.F.C.M.R.1987), the Air Force Court of Military Review had occasion to consider whether the discussion of matters relating to a plea in an unrecorded R.C.M. 802 conference and the subsequent failure to include that discussion in the record of trial resulted in a nonverbatim record of trial. In *Garcia*, the military judge took a recess during his inquiry into the providence of the accused's pleas. When the court reconvened, the judge stated that he had held an R.C.M. 802 conference during the recess wherein he had discussed "issues regarding the providency of the accused's plea" with counsel. *Id.* at 520. The military judge then returned to the plea inquiry, without further comment from anyone. *Id.* Finding that the lack of a record of the discussions that took place during the conference made the providence of the accused's pleas uncertain, the court set aside the findings and sentence. *Id.* at 521. In so holding, the Air Force court stated:

> Because the substance of the conference was not made part of the record, we cannot say that what was discussed at the conference was only peripheral to the judge's determination of the plea's providence. This uncertainty is unacceptable. Article 66(c), U.C.M.J. charges us with affirming "only such findings of guilty and the sentence or such part or amount of the sentence, as (we find) correct in law and fact and determine, on the basis of the entire record, should be approved." We cannot perform this thorough judicial review on a record that does not reveal all the components of such an important decision as the providence of the plea.

*Id.* at 520.

■ Our superior court, in a case involving the discussion of sentencing instructions and the order of argument during an R.C.M. 802 conference, held that, "in the absence of any objection by the parties on the record,

there is a waiver." *United States v. Curtis*, 44 M.J. 106, 151 (C.A.A.F.1996). We distinguish *Curtis*, however, from the present case because the military judge in the appellant's case considered evidence, heard argument, and issued rulings, all adversarial portions of the court-martial far different from discussions between the parties regarding proposed instructions to the members. What the military judge did in this case, in effect, was to hold telephonic motion sessions while the appellant and the public were absent, and there was no recording of the sessions upon which to create a verbatim record of trial.

■ We are compelled by the circumstances of this case to determine whether the omissions from the record of trial were substantial, whether the resulting record of trial was verbatim, and whether the appellant has suffered any prejudice because of the omissions. We note that we need not address the first two determinations if the record before us establishes that the presumption of prejudice that would arise from those determinations has been rebutted. *United States v. Santoro*, 46 M.J. 344, 347 (C.A.A.F.1997).

An examination of the subject of each R.C.M. 802 conference discloses that the appellant was not harmed in any way by the military judge's improper use of the conferences to adjudicate adversarial matters. For example, the record of trial indicates that the appellant was granted the expert assistance he requested, effectively mooting any argument that the military judge's denial of a motion to reconsider his earlier ruling on expert assistance. Record at 252. This is buttressed by the fact that the appellant raises no issue with regard to denial of expert assistance at trial, other than AOE LXXXVI, which alleges that the military judge abused his discretion by denying a defense motion for a change of venue and for expert assistance in litigating the change of venue request on the record. *Id.* at 386–87; AE CXII.

We note also that the appellant raises this issue with regard to the military judge's use of R.C.M. 802 conferences to determine whether to recall the defense experts as witnesses during the reopened findings phase of

the trial. There is no possible prejudice from the military judge's denial of the defense request because our ruling setting aside the findings of guilty to the charges of robbery and premeditated murder of LCpl Page now moot this issue. We find no possibility that the errors could have had any impact on the remaining findings of guilty to adultery and orders violations. While we roundly condemn the practice employed by the military judge in this case, we decline to grant relief based on this error.

Even assuming, *arguendo,* that the errors created by the military judge's misuse of R.C.M. 802 conferences impacted upon the appellant's constitutional rights, we would still grant no relief. Based on the record before us, we find that any such errors were harmless beyond a reasonable doubt and did not contribute to the members' findings of guilt. *United States v. Hall,* 58 M.J. 90, 94 (C.A.A.F.2003); *United States v. Walker,* 57 M.J. 174, 178 (C.A.A.F.2002); *United States v. Bins,* 43 M.J. 79, 86 (C.A.A.F.1995).

### Post–Trial Delay

In AOEs LVI and LXVI, the appellant asserts that he has been subject to cruel and unusual punishment by serving over a decade of confinement awaiting execution and that he has been denied due process by the excessive post-trial delay. We decline to grant relief.

As the Government points out and the appellant acknowledges, no American court appears to have found that a lengthy confinement followed by execution constitutes cruel and unusual punishment under the Eighth Amendment. *Moore v. Kinney,* 119 F.Supp.2d 1022, 1051 (D.Neb.2000)(holding that nineteen years in isolated, segregated confinement, under explicit death threats did not constitute cruel and unusual punishment), *rev'd on other grounds,* 278 F.3d 774 (8th Cir.2002); *Elledge v. State,* 911 So.2d 57, 76 (Fla.2005), *cert. denied,* 546 U.S. 1157, 126 S.Ct. 1173, 163 L.Ed.2d 1141 (2006); *Lucas v. State,* 841 So.2d 380, 389 (Fla.2003)(holding twenty-five years on death row does not constitute cruel and unusual punishment; death sentence reversed in four previous appeals); *Foster v. State,* 810 So.2d 910, 916 (Fla.2002)(holding twenty-three years on death row does not constitute cruel and unusual punishment); *Rose v. State,* 787 So.2d 786, 805 (Fla.2001) (holding cruel and unusual punishment claim of inmate under death sentence since 1977 was without merit; death sentence reversed once on direct appeal and a second time in post-conviction); *Knight v. State,* 746 So.2d 423, 437 (Fla.1998)(holding more than two decades on death row does not constitute cruel and unusual punishment). Nor do we find a violation of the Eighth Amendment in the appellant's case.

As for the issue of whether the appellant should be afforded relief for excessive post-trial delay, while we acknowledge that the appellant was deprived of the resolution of legal claims on which he has prevailed for over a decade, we also recognize the benefit he has derived from his appellate defense counsel compiling a comprehensive brief and assignments of error in excess of 500 pages that was subject to a lengthy Government answer and to the lengthy and exhaustive review by this court. Assuming, *arguendo,* that we were to determine that a due process violation had occurred and that the appellant had suffered prejudice or was otherwise entitled to relief for excessive post-trial delay, in light of our corrective action in this case, to fashion any further relief that would be "actual and meaningful in this case would be disproportionate to the possible harm generated from the delay." *United States v. Rodriguez–Rivera,* 63 M.J. 372, 386 (C.A.A.F. 2006). We are aware of our authority to grant relief under Article 66, UCMJ, and decline to grant relief. *United States v. Simon,* 64 M.J. 205 (C.A.A.F.2006); *Toohey v. United States,* 60 M.J. 100, 102 (C.A.A.F. 2004); *United States v. Tardif,* 57 M.J. 219, 224 (C.A.A.F.2002); *United States v. Brown,* 62 M.J. 602 (N.M.Ct.Crim.App.2005)(en banc). Accordingly, we conclude that no additional relief is appropriate or warranted in this case.

### Cumulative Error

The appellant argues, in AOE LVII that the cumulative effect of the errors in this case demands relief. We disagree. We are well aware that we "can order a rehearing based on the accumulation of errors not reversible individually." *United States v.*

*Dollente,* 45 M.J. 234, 242 (C.A.A.F.1996). In order to do so, however, we must first consider the case as a whole, the type and number of errors committed, any relationship between errors, any combined effect of errors, how the errors were dealt with by the military judge, and the strength of the evidence of the appellant's guilt. *Id.* (quoting *United States v. Sepulveda,* 15 F.3d 1161, 1196 (1st Cir.1993) (citation omitted)). Courts have been less likely to find cumulative error where the record contains overwhelming evidence of guilt. *Id.* (citing *United States v. Thornton,* 1 F.3d 149, 157 (3d Cir.1993)).

■ In *Dollente,* the evidence of guilt was not overwhelming. The Government's case relied on the alleged victim's credibility and the appellant was initially denied an expert witness who could provide an alternate explanation for her testimony against the appellant. Also, the prosecutor introduced inadmissible expert testimony bolstering the alleged victim's truthfulness. To make matters worse, the prosecution was allowed to present expert profile testimony before the members circumstantially identifying the appellant as the perpetrator. Under those circumstances, the court could not "say with any certainty that the cumulative effect of these errors did not affect the outcome of" the case. *Id.* at 243. Here, where the evidence of guilt is overwhelming, we cannot find any cumulative effect of the enumerated errors that demands relief.

### Conclusion

The findings of guilty to Specification 1 of Charge I, conspiracy to commit premeditated murder, robbery, and aggravated assault with regard to LCpl Page; Specification 2 of Charge I, conspiracy to kidnap and commit premeditated murder with regard to LCpl James; Specifications 1 and 2 of Charge II, violations of a general order; Specification 3 of charge III, premeditated murder of LCpl James; Specification 1 of Charge V, adultery; and Specification 3 of Charge V, kidnapping of LCpl James, are affirmed. The finding of guilty to Specification 1 of Charge III, premeditated murder of LCpl Page, is affirmed, except for the language "with premeditation". The sole Specification of Charge IV, robbery, is set aside. A rehearing as to the excepted language and the set aside finding of guilty is authorized. The sentence is set aside and a rehearing on sentence is authorized.

We have carefully considered each of the following assignments of error and find that they are made moot by our holding and corrective action in this case: XXXI, XXXIII through LV, LVIII, LIX, LXIII, CIX, CXIII through CXIX, CXXXV through CXLIII, CXLVI, CXLVII, CLVII, and CLVIII. We have carefully considered each of the following assignments of error and find them to be without merit: I, X, XI, XIII through XXVII, XXXII, LX through LXIV, LXVII through CII, CIV through CVIII, CX, CXI, CXX through CXXIV, CXLIV, CXLV, CXLVIII through CLVI. *See, United States v. Matias,* 25 M.J. 356, 361 (C.M.A.1987). Following our corrective action, we conclude that the remaining findings are correct in law and fact and that no further error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

Senior Judge ROLPH [13] and Senior Judge VINCENT concur.

### APPENDIX

### APPENDIX: ASSIGNMENTS OF ERROR

### SECTION ONE: ISSUES AFFECTING FINDINGS

### THE EXCLUSION OF EXCULPATORY EVIDENCE ISSUE

I: The military judge erred by denying the defense's request to present evidence that LCpl James's wife had both the motive and the opportunity to kill him.

---

**13.** Senior Judge Rolph participated in the decision of this case prior to commencing terminal leave.

ISSUES CONCERNING THE REOPEN-ING OF FINDINGS TO ADDRESS PARTIAL MENTAL RESPONSIBILI-TY

II: The military judge erred by refusing to allow the defense to present live expert testimony after he ordered the findings reopened to address a potential partial mental responsibility defense.

III: The military judge committed plain error by playing a tape recording of a portion of Dr. Phillips' Article 39(a) session testimony to the members without any finding that he was unavailable.

IV: The military judge committed plain error by failing to provide the members with sufficient instructions to adequately guide their deliberations on the reopened findings.

V: Trial counsel's closing argument at the end of the reopened findings phase violated Appellant's right against self-incrimination and due process.

VI: The military judge committed plain error by allowing trial counsel to comment on LCpl Walker's right to remain silent during his rebuttal argument during the reopened findings phase and by failing to provide a curative instruction.

VII: The military judge abused his discretion when, after he allowed the members to re-deliberate on the findings, he failed to instruct the members to disregard improper comments made during the government's closing arguments or to properly limit the evidence the members could consider in their second deliberations on findings, and failed to grant a mistrial in violation of Appellant's Fifth, Sixth, and Eighth Amendment rights.

THE DENIED CONTINUANCE REQUEST ISSUE

VIII: The military judge erred by denying a defense continuance request to provide a substitute expert with sufficient opportunity to examine LCpl Walker after the initial expert unexpectedly engaged in misconduct that prevented the defense from calling him as a witness.

DISCOVERY ISSUES

IX: The military judge erred by violating Article 46's requirement that the defense receive equal access to the evidence by repeatedly denying the defense's requests for access to the evidence for independent testing, ruling that the defense experts "can look at" the government's evidence, "but they can't touch it." Record at 379.

X: The military judge erred by failing to order any effective remedy after the government violated his order to allow the defense counsel to examine the Federal Bureau of Investigation and the North Carolina State Bureau of Investigation Laboratories that conducted tests of the evidence.

SEVERANCE ISSUES

XI: The military judge erred by denying the defense's motion to sever trial on the charges related to the two separate murders.

XII: The military judge erred by failing to deliver a spill-over instruction despite previously concluding that such an instruction was "necessary" as an alternative to severing the charges.

FINDINGS ARGUMENT ISSUES

XIII: Trial counsel committed plain error in his findings, closing and rebuttal arguments when he misrepresented the testimony of Dr. Fox and Appellant's alleged co-conspirators.

XIV: The trial counsel committed plain error by arguing Appellant "harbored premeditated design" because he associated with LCpl Parker, whom the trial counsel called, "Not a wholesome, peaceful guy."

WITNESS PRODUCTION ISSUE

XV: The military judge violated LCpl Walker's constitutional right to the production of witnesses when he refused to compel the production of a witness to testify under Military Rule of Evidence 806 that a hearsay declarant had a reputation for untruthfulness.

OTHER EXPERT ISSUES

XVI: The military judge erred in failing to inquire into the reliability of the opinions of

the government tool mark and firearms expert.

XVII: The military judge abused his discretion in denying Appellant's requests for *ex parte* hearings on requests for expert assistance.

## EVIDENTIARY ISSUES

XVIII: The military judge committed reversible error by overruling the defense objection to trial counsel's eliciting references to the movie *New Jack City*.

XIX: The military judge erred by admitting the hearsay statements of co-conspirators made after the object of the conspiracy had been completed and therefore not in furtherance of the conspiracy.

XX: The military judge erred in admitting the backside of Prosecution Exhibit 163 (a note taken in the brig from Appellant), over defense objection, where the writing on the backside of the note was not relevant and more prejudicial than probative.

## FINDINGS INSTRUCTIONS ISSUES

XXI: The military judge abused his discretion by refusing to give the defense requested instruction defining premeditation in terms of reflection with a cool mind.

## VOIR DIRE AND MEMBERS CHALLENGE ISSUES

XXII: Appellant received ineffective assistance of counsel because his detailed defense counsel voluntarily reduced the size of the members panel by challenging for cause Lieutenant Colonel Combs and peremptorily challenging Colonel Forbush.

XXIII: The military judge committed reversible error by failing to *sua sponte* control voir dire and prevent counsel from injecting an irrelevant factor into the members' findings deliberations.

XXIV: The trial counsel committed reversible error by participating in the selection of members with the staff judge advocate.

XXV: The military judge committed reversible error by improperly prohibiting the defense from questioning the members during voir dire about their views on possible mitigation evidence.

XXVI: The court-martial lacked jurisdiction because the convening authority did not select members "best qualified" to serve on the panel as required by Article 25, UCMJ.

XXVII: The military judge erred by not ensuring all prospective panel members were questioned on racial prejudice during voir dire as constitutionally required under certain "special circumstances" and as generally required of federal courts by the United States Supreme Court, in violation of the Due Process Clause and the Eighth Amendment.

## FACTUAL AND LEGAL SUFFICIENCY ISSUES

XXVIII: The evidence is factually and legally insufficient to establish that LCpl Walker possessed the specific intent required to form a conspiracy to commit premeditated murder of LCpl Page or actually committed premeditated murder of LCpl Page.

XXIX: The evidence is factually and legally insufficient to establish that LCpl Walker committed the premeditated murder of LCpl James where he may have acted in self-defense and where Vicky James may have committed the murder.

XXX: The evidence is legally and factually insufficient to establish LCpl Walker kidnapped LCpl James where LCpl James drove his own vehicle to the place of the shooting.

## CUMULATIVE ERROR

XXXI: The cumulative errors in this case compel reversal of the findings.

## SYSTEMIC ERRORS

XXXII: The United States Marine Corps' failure to establish an independent defense bar violates Appellant's Sixth Amendment right to effective representation.

XXXIII: A sentence to death by a panel composed of ten members violates Article 55, UCMJ, and the Fifth and Eighth Amendments because the result is an arbitrary,

unreliable, and inconsistent application of the death penalty and is fundamentally unfair. *But see Gray,* 51 M.J. at 66; *Loving,* 41 M.J. at 287; *Curtis,* 32 M.J. at 267–68.

## SECTION TWO: ISSUES AFFECTING SENTENCE

## DENIAL OF MITIGATING EVIDENCE OF CO–CONSPIRATORS SENTENCES

XXXIV: The military judge erred by denying the defense request to inform the members of the non-capital sentences of four of his co-conspirators as a mitigating circumstance.

## THE AGGRAVATING FACTOR NOTICE ISSUE

XXXV: The trial counsel's failure to give notice of the aggravating factors before arraignment as required by R.C.M. 1004(b)(1) precluded the court-martial from adjudging a death sentence.

## *RING V. ARIZONA* ISSUES

XXXVI: Appellant was tried for an offense over which the court-martial had no jurisdiction because a person other than the convening authority referred the charge in violation of Article 55, UCMJ and the Fifth and Eighth Amendments.

XXXVII: The Supreme Court's decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428 (2002) requires that the members find that aggravating circumstances substantially outweigh mitigating circumstances beyond a reasonable doubt.

XXXVIII: Based on the Supreme Court's reasoning in *Ring v. Arizona, supra,* Congress unconstitutionally delegated to the President the power to enact the functional equivalent of elements of capital murder, a purely legislative function.

XXXIX: The notice requirement in R.C.M. 1004(b)(1), where notice of aggravating factors is not required on the charge sheet or at the Article 32 hearing, violated Appellant's rights to due process, notice, and effective assistance of counsel.

XL: The standard of proof for aggravating circumstances in R.C.M. 1004(b)(4) violates Appellant's right to due process under the Fifth, Sixth, and Eighth Amendments because the facts that form the basis for a determination that leads to the death sentence must be determined by the members beyond a reasonable doubt.

## AGGRAVATING FACTOR ISSUES

XLI: Aggravating Factor Three is invalid because the evidence is factually insufficient that LCpl James was murdered in the course of a kidnapping.

XLII: Aggravating Factor One, the felony murder of LCpl Page, is invalid because the death was not a consequence of the underlying felony.

XLIII: The multiple murders aggravating factor may not be constitutionally applied to two unrelated murders tried in the same court-martial and such an interpretation is inconsistent with the intent of R.C.M. 1004.

## INEFFECTIVE ASSISTANCE OF COUNSEL IN SENTENCING ISSUES

XLIV: Appellant was denied his Sixth Amendment right to effective assistance of counsel when his counsel did not introduce crucial evidence in extenuation.

## VICTIM–IMPACT EVIDENCE ISSUES

XLV: The admission of the victims' family's characterizations of the crimes and of Appellant violated Appellant's Fifth and Eighth Amendment rights to a fair sentence in a capital case.

XLVI: Admission of victim-impact evidence unrelated to the offenses violated R.C.M. 1001(b)(4) and the Fifth and Eighth Amendments.

XLVII: The impact of the trial was improper evidence in aggravation under R.C.M. 1001(b)(4) and violated Appellant's rights to due process under the Fifth and Eighth Amendments.

XLVIII: The military judge committed reversible error by admitting detailed and emotional testimony regarding the victims' life in violation Appellant's First, Fifth, and Eighth Amendment rights.

## AGGRAVATING CIRCUMSTANCES ISSUES

XLIX: The military judge erred by double counting the aggravating factor "engaged in the commission of a robbery" and the aggravating circumstance "forced into a dark alley ... at gun point where he was robbed and murdered."

L: The military judge violated Appellant's Fifth and Eighth Amendment Rights to a reliable death sentence when he allowed the members to consider as aggravating circumstances "any and all other circumstances as presented by the prosecution."

LI: The government subverted the burden of proof for an aggravating factor by alleging two aggravating circumstances that met the definition of R.C.M. 1004(c)(7)(I).

LII: Aggravating circumstance four is factually incorrect, LCpl Brown provided the weapon used during the murder of LCpl Page.

## SENTENCING INSTRUCTION ISSUES

LIII: The military judge erred in giving a defective reasonable doubt instruction during the sentencing phase that lowered the burden of proof for the aggravating factors.

## SENTENCING ARGUMENT ISSUE

LIV: The trial counsel's improper and inflammatory closing argument during sentencing was plain error, denied Appellant a fair trial and resulted in an unreliable death sentence in violation of the Fifth and Eighth Amendments.

## SENTENCING DISCOVERY ISSUE

LV: The military judge erred in denying Appellant discovery of and equal access to evidence of racial incidents aboard Camp Lejeune, North Carolina, in the months preceding the killing of LCpl Page.

## THE EXCESSIVE DELAY ISSUE

LVI: Combining a death sentence with the extended period of confinement that LCpl Walker has already served constitutes cruel and unusual punishment in violation of the Eighth Amendment and Article 55, UCMJ and a violation of his due process right to a timely appellate review.

## CUMULATIVE ERROR

LVII: The cumulative errors in this case compel reversal of the sentence.

## SENTENCE APPROPRIATENESS

LVIII: This Court should expand the universe of cases it reviews in proportionality review to ensure racial discrimination was not part of the sentencing decision in Appellant's court-martial.

LIX: The death sentence is inappropriately severe to punish a Marine whose actions were the product of acute alcohol intoxication and was unable to conform his conduct to the law due to a mental disease or defect.

## ISSUES AFFECTING THE CONVENING AUTHORITY'S ACTION

LX: The second convening authority's action must be set aside because the staff judge advocate abandoned his neutrality by collaborating with a disqualified counsel from the Navy–Marine Corps Appellate Government Division.

LXI: The assistant trial counsel erred by failing to permit the defense counsel to examine the record of trial before authentication.

## ISSUES AFFECTING APPELLATE REVIEW

LXII: This Court is not properly composed under Article 66, UCMJ, to review Appellant's court-martial because the Judge Advocate General delegated his Article 66, UCMJ responsibility to the Deputy Judge Advocate General.

LXIII: The record of trial is not complete because the record failed to record the testi-

mony of Dr. Phillips replayed for the members during the reopened findings phase.

LXIV: The record of trial is not complete because Prosecution Exhibit 163 (a note allegedly passed between LCpl Parker and LCpl Walker while in the brig) is not the original; and therefore, the record is not verbatim.

LXV: Because the military judge repeatedly employed R.C.M. 802 conferences to litigate important issues in the case, including expert-production issues, the record of trial is incomplete.

## SUMMARY ASSIGNMENTS OF ERROR

LXVI: The post trial delay in this case is so excessive, even for a capital case, that it requires the sentence of death to be set aside even if Appellant's anxiety over a pending death sentence is not considered. Article 66, UCMJ.

LXVII: The role of the convening authority in the military justice system denied Appellant a fair and impartial trial in violation of the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ, by allowing the convening authority to act as a grand jury in referring capital criminal cases to trial, personally appointing members of his choice, rating the members, holding the ultimate law enforcement function within his command, rating his legal advisor, and acting as the first level of appeal, thus creating the appearance of impropriety through a perception that he acts as prosecutor, judge, and jury. *See United States v. Jobson*, 31 M.J. 117, 121 (C.M.A.1990) (courts-martial should be "free from substantial doubt as to legality, fairness, and impartiality."); *but see Loving*, 41 M.J. at 296–97.

LXVIII: The role of the convening authority in the military justice system in selecting court-martial members denied Appellant a fair and impartial trial in violation of the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ.

LXIX: Appellant was denied his right under the Fifth Amendment to a grand jury presentment or indictment. *But see Curtis*, 44

M.J. at 130 (citing *Johnson v. Sayre*, 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914 (1895)).

LXX: Due Process requires that trial and intermediate appellate judges in a peacetime military death penalty case have the protection of a fixed term of office. *But see Loving*, 41 M.J. at 295.

LXXI: The system whereby the Judge Advocate General of the Navy appoints trial and appellate judges to serve at his pleasure is unconstitutional as it violates the Appointments Clause. *But see Loving*, 41 M.J. at 295.

LXXII: The court-martial lacked jurisdiction over the capital murder alleged in specifications 1 and 2 of Charge III because trial by court-martial of a service member for capital murder which occurred within the United States during peacetime is unconstitutional under Articles I and III and the Fifth and Eighth Amendments to the Constitution.

LXXIII: Appellant's court-martial lacked jurisdiction because the military judge and the convening authority were "principal officers" whom the President did not appoint as required by the Appointments Clause. See U.S. Const., Art. II, § 2, cl. 2; *but see United States v. Grindstaff*, 45 M.J. 634 (N.M.Ct. Crim.App.1997), *cf. Edmond v. United States*, 520 U.S. 651, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997) (civilian judges of the Coast Guard Court of Criminal Appeals are "inferior officers" for purposes of the Appointments Clause and do not require presidential appointment).

LXXIV: The prohibition in R.C.M. 1004 against guilty pleas in capital cases deprived Appellant of the opportunity to plead guilty and the substantial mitigation afforded by a guilty plea. *But see Curtis*, 44 M.J. at 141; *Loving*, 41 M.J. at 292. In *United States v. Jackson*, 390 U.S. 570, 584, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court stated that though there is no constitutional right to plead guilty, "the automatic rejection of all guilty pleas 'would rob the criminal process of much flexibility.'"

LXXV: Article 18, UCMJ, and R.C.M. 201(f)(1)(C), which require trial by members in a capital case, violate the Fifth and Eighth Amendment guarantees of due process and a

reliable verdict. *But see Curtis,* 44 M.J. at 130; *Loving,* 41 M.J. at 291.

LXXVI: Article 45, UCMJ, and R.C.M. 910(a)(1), which require a Not Guilty plea to offenses for which death may be adjudged, violate the Fifth, Sixth, and Eighth Amendment guarantees of due process and a reliable verdict. *But see Curtis,* 44 M.J. at 130; *Loving,* 41 M.J. at 291.

LXXVII: LCpl Walker suffered illegal pretrial punishment in violation of Article 13, UCMJ and the Fifth Amendment, when the Base Brig, Marine Corps Base, Camp Lejeune, North Carolina, confined in conditions more rigorous than those required to insure his presence at trial. R. at 135–37; *see United States v. Evans,* 55 M.J. 732 (N.M.Ct. Crim.App.2001).

LXXVIII: Court-martial procedures denied Appellant his Article III right to a jury trial. *But see Curtis,* 44 M.J. at 130–33.

LXXIX: LCpl Walker was denied due process because he was not guaranteed a twelve-member panel by the UCMJ. *See Curtis,* 32 M.J. at 271 (Sullivan, C.J., concurring); *but see Loving,* 41 M.J. at 297; *Curtis,* 32 M.J. at 267–68.

LXXX: The exclusion of enlisted members from Appellant's unit from court-martial service under Article 25(c)(1), UCMJ is a racially discriminatory rule that precludes African–American enlisted men from having their peers sit as members of the court-martial. *But see Curtis,* 44 M.J. at 130–32.

LXXXI: The convening authority did not understand the law and his options, including detailing an all-enlisted panel and random selection of members for his further screening, regarding detailing of enlisted members under Article 25, UCMJ. *But see Curtis,* 44 M.J. at 132.

LXXXII: The Fifth, Sixth, and Eighth Amendments of the Constitution do not permit, in peacetime, a convening authority to hand-pick military subordinates, whose careers he can directly and immediately affect and control, as members to decide a capital case. *But see Curtis,* 44 M.J. at 132; *Loving,* 41 M.J. at 297.

LXXXIII: The variable size of the court-martial panel constituted an unconstitutional condition on Appellant's fundamental right to conduct voir dire and promote an impartial members panel.

LXXXIV: The death sentence in this case violates the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ, because the military system does not guarantee a fixed number of members.

LXXXV: The military judge abused his discretion and violated the liberal-grant mandate when he denied Appellant's challenge for cause against Col Forbush based on his inelastic attitude toward Appellant's Fifth Amendment right to remain silent. *See United States v. Miles,* 58 M.J. 192, 195 (2003); *but see United States v. Ovando–Moran,* 48 M.J. 300 (1998).

LXXXVI: The military judge abused his discretion by denying the defense motion for a change of venue and for expert assistance to assist in litigating the change of venue request. Record at 386–87; Appellate Exhibit 112.

LXXXVII: The trial counsel committed reversible error by using the voir dire of the members to impermissibly advance the government's theory of the case. *See* R.C.M. 912(b), Discussion.

LXXXVIII: The military judge failed to adequately instruct the members that the discretion not to impose the death penalty was individual. Record at 2041.

LXXXIX: Appellant was denied a fair trial by the convening authority's exclusion of women from the court-martial panel in violation of the Fifth, Sixth, and Eighth Amendments and Articles 25 and 55, UCMJ. *But see Curtis,* 44 M.J. at 130–33.

XC: The selection of the panel members by the convening authority in a capital case in peacetime directly violates Appellant's rights under the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ, by in effect giving the government unlimited peremptory challenges. *See United States v. James,* 61 M.J..132, n. 4 (2005); *but see Loving,* 34 M.J. at 968.

XCI: A sentence of death by a panel composed as few as five members violates the Fifth and Eighth Amendments and Article 55, UCMJ, because the result is an arbitrary, unreliable, and inconsistent application of the death penalty and is fundamentally unfair.

XCII: The death sentence in this case violates the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ, because the members were not randomly selected and selected from Appellant's community. *But see Thomas,* 43 M.J. at 593.

XCIII: Appellant was denied his right to a trial by an impartial jury composed of a fair cross-section of the community in violation of the Sixth and Eighth Amendments. *But see Curtis,* 44 M.J. at 130–32.

XCIV: The exclusion from court-martial service of enlisted members of the same unit as a military accused by Article 25(c)(1), UCMJ, injects an improper panel-member-pool-selection criterion, i.e., enlisted status. *But see Curtis,* 44 M.J. at 132 (not ruling on the error, but stating error was waived because it was not raised).

XCV: The President exceeded his Article 36, UCMJ, powers to establish procedures for courts-martial when he granted trial counsel a peremptory challenge and thereby the power to nullify the convening authority's Article 25(d), UCMJ, authority to detail members of the court-martial. *But see Curtis,* 44 M.J. at 130–33.

XCVI: The peremptory challenge procedure in the military justice system, which allows the government to remove any one member without cause, in capital cases, violates the Fifth and Eighth Amendments because it allows a prosecutor to remove a member whose moral bias against the death penalty does not justify a challenge for cause. *But see Curtis,* 44 M.J. at 131–32; *Loving,* 41 M.J. at 294–95.

XCVII: The designation of the senior member as the presiding officer for deliberations denied Appellant a fair trial before impartial members in violation of the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ. *But see Curtis,* 44 M.J. at 150; *Thomas,* 43 M.J. at 602.

XCVIII: The denial of the right to poll the members regarding their verdict at each stage of the trial denied Appellant a fair trial before impartial members in violation of the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ. *But see Curtis,* 44 M.J. at 150; *Thomas,* 43 M.J. at 602. Wherefore, this Court should set aside the death sentence and approve a sentence of life imprisonment, a dishonorable discharge, total forfeitures, and reduction to pay grade E–1.

XCIX: Discussion of findings and sentencing instructions at R.C.M. 802 conferences denied Appellant his right to be present at "every stage of the trial." *See* R.C.M. 804(a); *cf. State v. Meyer,* 345 N.C. 619, 481 S.E.2d 649 (1997) (capital defendant's absence from in-chambers conference was a violation of the state constitutional right of capital defendants to be present at all stages of trial and required resentencing); *but see Curtis,* 44 M.J. at 150–51.

C: The military judge abused his discretion in failing to give the members an opportunity to examine three government witnesses. Record at 799, 802, 812; see also R.C.M. 801(c); Mil. R. Evid. 614(b); *United States v. Lampani,* 14 M.J. 22 (C.M.A.1982).

CI: The military judge erred in admitting the evidence seized in an unlawful search of Appellant's vehicle in violation of the Fourth Amendment and Mil. R. Evid. 313, 314, 315, and 316. Record at 254, 258, 303–04; Appellate Exhibit CVI.

CII: The military judge erred in admitting the evidence seized in an unlawful search of a storage bin rented by Appellant in violation of the Fourth Amendment and Mil. R. Evid. 315 and 316. Record at 254, 258, 303–04; Appellate Exhibit CVI.

CIII: The military judge erred in permitting government experts in serology, blood spatter, fiber analysis, and ballistic tool marks to testify regarding evidence to which Appellant was denied any access for independent testing purposes. Record at 239, 247, 379, 484–85, 1299; *see also* Art. 46, UCMJ; *United States v. Kinney,* 56 M.J. 156 (2001).

CIV: The military judge erred in admitting the testimony of Special Agent Deaver because his testimony that any size blood drop-

lets would be constituent with a shotgun-type injury was not helpful to the members. Record at 1308–10; *see* R.C.M. 702; *see also United States v. Houser,* 36 M.J. 392, 397 (C.M.A.1993).

CV: The military judge erred in failing to *sua sponte* inquire into the reliability of the blood spatter testimony of Special Agent Deaver from the North Carolina Crime Lab in violation of the Fifth Amendment. Record at 1307–10; *see United States v. Griffin,* 50 M.J. 278, 284 (1999).

CVI: The military judge erred by asking Dr. Fox a question concerning LCpl Walker's mental state two or three days after LCpl Page's murder when the defense made a proper beyond-the-scope objection. The military judge initially indicated he would not ask the question, and the question tended to improperly conflate LCpl Walker's mental responsibility on the night of LCpl Page's murder and on the night of LCpl James's murder. Record at 1617, 1619, 1622. When combined with the other errors in this case, the military judge's erroneous decision to ask this question deprived LCpl Walker of a fair and accurate determination of the findings in violation of the Fifth and Eighth Amendments.

CVII: The military judge abused his discretion by refusing to instruct the members on self-defense and to allow Appellant to present self-defense evidence. Record at 422, 450, 452, 463, 960–61, 1047, 1240, 1474, and 1477; *United States v. Rose,* 28 M.J. 132 (C.M.A.1989); *but see Curtis,* 44 M.J. at 155.

CVIII: The trial counsel committed plain error when he stated, "the military judge will instruct you that people normally intend the natural and probable consequences of their actions," Record at 1683, thereby, converting the permissive inference the military judge instructed upon, Record at 1716, into a mandatory inference in violation of the Fifth and Eight Amendments. *See United States v. Baker,* 57 M.J. 330, 335–36 (2002).

CIX: The trial counsel plainly erred when he shifted the burden of proof for partial mental responsibility to appellant by equating partial mental responsibility to voluntary intoxication in his closing argument during the re-opened findings proceeding. Record at 2000–01.

CX: The military judge committed plain error by listing certain matters derived from the victim-impact evidence presented in the penalty phase, and instructing the members that these certain matters constituted "aggravating circumstances," in violation of Appellant's rights under the Fifth, Sixth, and Eighth Amendments. *See Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

CXI: There is no meaningful distinction between premeditated and unpremeditated murder allowing differential treatment and sentencing disparity in violation of the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ. *But see Loving,* 41 M.J. at 279–80.

CXII: The evidence is legally and factually insufficient to support a finding of guilty as to Charge IV and its specification, the robbery of LCpl Page.

CXIII: The evidence is legally and factually insufficient to support a finding of guilty as to Charge III, specification 2, the felony murder of LCpl Page.

CXIV: The death sentence in this case violates the Fifth and Eighth Amendments and Article 55, UCMJ, because R.C.M. 1004 unconstitutionally permits a person other than the convening authority to specify aggravating factors.

CXV: The aggravating factor for the premeditated murder of LCpl Page, that the murder was committed while the accused was engaged in the commission of a robbery, did not satisfy the *Enmund v. Florida,* 458 U.S. 782, 788–91, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) requirement for culpability where Appellant did not have the intent to commit a robbery and the theft was tangential to the shooting.

CXVI: The death sentence in this case violates the Fifth and Eighth Amendments and Article 55, UCMJ, because the members should have been required to find Appellant guilty of the robbery and kidnapping specifications by unanimous vote because they were capital-aggravating factors.

CXVII: The death sentence must be set aside because there is no explicit finding that all the members concurred that the extenuating and mitigating factors were substantially outweighed by the aggravating factors and circumstances. *See* R.C.M. 1004(b)(4)(C); *cf. State v. Coffey,* 326 N.C. 268, 389 S.E.2d 48, 64–65 (1990) (death sentence set aside where sentencing form used by jury did not contain a written statement that aggravating circumstances outweighed mitigating circumstances, as required by state statute); *but see Curtis,* 44 M.J. at 159.

CXVIII: The aggravating circumstance "that the murder of LCpl Page was ... racially motivated ...." was an unconstitutional infringement on Appellant's equal protection rights. *See Wisconsin v. Mitchell,* 508 U.S. 476, 482 n. 2, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) (noting the Court did not review the constitutionality of the hate crime statute under an equal protection analysis).

CXIX: R.C.M. 1004 is unconstitutional because it describes no procedures for pleading sentencing aggravating factors on the charge sheet and submitting them to the Article 32 process as is required after *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

CXX: R.C.M. 1001 unconstitutionally forces an accused to forgo constitutionally required, under the Eight Amendment, mitigation evidence because the government may relax the Military Rules of Evidence (1001(c)(3)). *See United States v. Jackson,* 390 U.S. 570, 583, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (a statute that deters a defendant from asserting his Fifth and Sixth Amendment rights to plead not guilty and request a jury trial by removing the specter of a death sentence is an unconstitutional condition on those rights).

CXXI: The military judge erred in admitting victim-impact evidence regarding the personal characteristics of the victim, which could not reasonably have been known by Appellant at the time of the offense in violation of the Fifth and Eighth Amendment. *See South Carolina v. Gathers,* 490 U.S. 805, 811–12, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989); *see also People v. Fierro,* 1 Cal.4th 173, 3 Cal.Rptr.2d 426, 821 P.2d 1302, 1348–50 (1991) (Kennard, J., concurring in part, dissenting in part).

CXXII: R.C.M. 1001(b)(4) is unconstitutionally vague and overbroad as applied to Appellant and capital sentencing proceedings because it permits the introduction of circumstances that could not reasonably have been known by Appellant at the time of the offense in violation of the Fifth and Eighth Amendments. *See South Carolina v. Gathers,* 490 U.S. at 811–12, 109 S.Ct. 2207; *see also People v. Fierro,* 1 Cal.4th 173, 3 Cal. Rptr.2d 426, 821 P.2d 1302, 1348–50 (1991) (Kennard, J., concurring in part, dissenting in part).

CXXIII: The military judge erred in admitting Prosecution Exhibits 183 and 184 because they were improper victim-impact evidence under the Fifth and Eighth Amendments and R.C.M. 1001(b)(4). *But see Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

CXXIV: The military judge erred by failing to sua sponte declare a mistrial on the basis of the trial counsel's highly inflammatory, improper sentencing argument. *See Garron v. State,* 528 So.2d 353 (Fla.1988).

CXXV: Appellant's death sentence is invalid under the Fifth and Eighth Amendments and Article 55, UCMJ, because the members were improperly permitted to consider "lack of rehabilitative potential," "preservation of good order and discipline," and "specific deterrence" in sentencing deliberations. Record at 2028; *but see Loving,* 41 M.J. at 268–69.

CXXVI: The military death penalty is unconstitutional because Articles 32 and 34, UCMJ, allow arbitrary and capricious capital referrals in violation of the Fifth and Eighth Amendments and Article 55, UCMJ. Wherefore, this Court should set aside the death sentence and approve a sentence of life imprisonment, a dishonorable discharge, total forfeitures, and reduction to pay grade E–1.

CXXVII: Appellant was denied his right to equal protection under the Fifth and Eighth Amendments and Article 36, UCMJ, because the military has no system for centralized

death penalty decision making similar to that employed in Federal District Courts.

CXXVIII: Appellant's death sentence violates the Eighth Amendment because the capital-referral system operates in an arbitrary and capricious manner. *But see Loving,* 41 M.J. at 293–94.

CXXIX: The military judge erred by failing to require the members to complete a certificate that race was not a factor in their adjudication of the death penalty, in violation of Appellant's due process and equal protection rights under the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ.

CXXX: The military judge violated Appellant's Fifth Amendment right to confront witnesses by refusing the defense request to recall Dr. Phillips after reopening the findings portion of the court-martial. Record at 1980.

CXXXI: Article 118, UCMJ, fails to comply with the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), in that Congress has not enacted any change to Article 118, UCMJ, that would sufficiently narrow the class of individuals that warrant a death sentence. *But see Loving,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

CXXXII: The death sentence violates Appellant's right to equal protection under the Fifth Amendment because R.C.M. 1004 subjected him, as a member of the Armed Forces, to a penalty that would not otherwise be available under the United States Code for identical criminal conduct. *But see Loving,* 41 M.J. at 294.

CXXXIII: The death sentence in this case violates the Ex Post Facto Clause, the Fifth and Eighth Amendments, the Separation of Powers Doctrine, the Preemption Doctrine, and Article 55, UCMJ, because when it was adjudged neither Congress nor the Navy had specified a means or place of execution. *See* SECNAVINST 5815.4; *but see United States v. Tipton,* 90 F.3d 861, 901–03 (4th Cir.1996).

CXXXIV: The death penalty provision of Article 118, UCMJ, is unconstitutional as it relates to traditional common law crimes that occur in the United States in time of peace. *But see Loving,* 41 M.J. at 293. The Court resolved the issue against Loving, adopting the reasoning of the decision of the Army Court of Military Review. *See Loving,* 34 M.J. at 967. However, *Loving's* argument before the Army Court was predicated on the Tenth Amendment and the Necessary and Proper Clause. *Id.* Appellant's argument is predicated on the Eighth Amendment.

CXXXV: R.C.M. 1004 is unconstitutional under the Fifth and Eighth Amendments and violates Article 55, UCMJ, by not requiring that sentencing procedures are more detailed and specific to allow a rational understanding by the military judge and convening authority as to the standards used by the members. *But see Curtis,* 32 M.J. at 269.

CXXXVI: The death sentence in this case violates the Fifth and Eighth Amendments and Article 55, UCMJ, because the convening authority has not demonstrated how the death penalty would enhance good order and discipline in the Marine Corps.

CXXXVII: R.C.M. 1004 is unconstitutional because it does not give the military judge the power to adjust or suspend a death sentence that is improperly imposed. *But see Loving,* 41 M.J. at 297.

CXXXVIII: Because of the inherent flaws in the military justice system, the death penalty violates the prohibition against cruel and unusual punishment under all circumstances. *But see Thomas,* 43 M.J. at 606.

CXXXIX: The death penalty is, in all circumstances, cruel and unusual punishment, forbidden by the Eighth Amendment. *See Gregg v. Georgia,* 428 U.S. 153, 227, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Brennan, J., dissenting); *but see id.* at 168, 96 S.Ct. 2909 (death penalty is not unconstitutional per se).

CXL: The death penalty cannot constitutionally be implanted under current Eighth Amendment jurisprudence. *See Callins v. Collins,* 510 U.S. 1141, 1143–59, 114 S.Ct. 1127, 127 L.Ed.2d 435 (Blackmun, J., dissenting on denial of certiorari).

CXLI: R.C.M. 1209 and the military death penalty system generally deny due process and constitute cruel and unusual punishment and is tantamount to foreseeable, state-spon-

sored execution of innocent people because there is no exception for actual innocence to the finality of a court-martial review. *Cf. Triestman v. United States,* 124 F.3d 361, 378–79 (2d Cir.1997).

CXLII: The military death penalty system in Appellant's case violates the prohibition against cruel and unusual punishment because the sentence of life without the possibility of parole was not available at the time of Appellant's trial.

CXLIII: The death sentence in this case violates the Fifth and Eighth Amendments and Article 55, UCMJ, because the convening authority has unlimited discretion to approve it.

CXLIV: R.C.M. 1001(b)(4) is unconstitutionally vague and overbroad as applied to Appellant and capital sentencing proceedings because it permits the introduction of evidence beyond that of direct family members and those present at the scene of the crime in violation of the Fifth and Eighth Amendments.

CXLV: The staff judge advocate was disqualified from advising the convening authority regarding his post trial action because the staff judge advocate actively participated in the preparation of the government's case. *See United States v. Gutierrez,* 57 M.J. 148 (2002).

CXLVI: LCpl Walker cannot be executed because he had an IQ at the time of the commission of these offenses of 87 and significant deficits in adaptive functioning. See Record at 1947–49, 2042–43. "Mental retardation is not a product of IQ scores alone and that an individual's ability to adaptively function in society is a vital element of a retardation diagnosis." *In re Holladay,* 331 F.3d 1169, 1175 (11th Cir.2003) (citing *Atkins v. Virginia,* 536 U.S. 304, 308, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).

CXLVII: LCpl Walker cannot be executed because, at the time of LCpl Page's murder, he had the functional ability of a mentally retarded person due to acute organic brain syndrome cause by alcohol intoxication. Record at 1597. "Mental retardation is not a product of IQ scores alone and that an individual's ability to adaptively function in society is a vital element of a retardation diagnosis." *In re Holladay,* 331 F.3d 1169, 1175 (11th Cir.2003) (citing *Atkins v. Virginia,* 536 U.S. 304, 308, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).

CXLVIII: The court-martial lacked jurisdiction because the judges of this Court are "principal officers" whom the President did not appoint as required by the Appointments Clause. U.S. Const., Art. II, § 2, cl. 2; *but see United States v. Grindstaff,* 45 M.J. 634 (N.M.Ct.Crim.App.1997); *cf. Edmond v. United States,* 520 U.S. 651, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997) (civilian judges of the Coast Guard Court of Criminal Appeals are "inferior officers" for purposes of the Appointments Clause, and thus do not require Presidential appointment).

CXLIX: This Court lacks jurisdiction and authority to review the constitutionality of the Rules for Courts–Martial and the UCMJ because this Court is an Article I court, not an Article III court, which has the power of checking Congress and the President under *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *see also Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (the power to strike down unconstitutional statutes or executive orders is the exclusive check of the Article III judiciary); *but see Loving,* 41 M.J. at 296.

CL: The Judge Advocate General of the Navy's preparation of the Navy–Marine Corps Court of Criminal Appeals judges' fitness reports deprives this Court of its independence and the appearance of independence. *But see Curtis,* 44 M.J. at 164.

CLI: Appellant has been denied equal protection of the laws in violation of the Fifth Amendment in that all civilians in the United States are afforded the opportunity to have their criminal cases reviewed by an Article III court, but members of the Armed Forces, by virtue of their status as service members, are not. *But see Loving,* 41 M.J. at 295.

CLII: Article 142(b)(2), UCMJ's limitation of Court of Appeals for the Armed Forces judges to terms of office of fifteen years violates Article III, Section 1 of the Constitution, which guarantees a life term of office to

judges of inferior courts established by Congress. *But see Curtis*, 44 M.J. at 164; *Loving*, 41 M.J. at 295.

CLIII: Appellant has been denied equal protection in violation of the Fifth Amendment in that all members of the United States Army are afforded the opportunity to have their cases reviewed by trial and appellate judges that have the protection of a fixed term of office as required by the Due Process Clause, but members of the United States Marine Corps do not. *See also* Article 36(b), UCMJ.

CLIV: Appellant was denied his right to representation by counsel qualified under the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) at trial and on appeal, in violation of the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ. *But see Curtis*, 44 M.J. at 126–27; *Loving*, 41 M.J. at 300.

CLV: Appellant was denied his right to representation by counsel qualified under 21 U.S.C. § 848(q)(5)-(6), (8) (2000) at trial and on appeal, in violation of the Fifth, Sixth, and Eighth Amendments and Articles 36 and 55, UCMJ.

CLVI: Appellant was denied effective assistance of appellate counsel due to the actual conflict of interest and the appearance of a conflict of interest created by the Navy–Marine Corps Appellate Defense Division's concurrent representation of Appellant and alleged co-conspirators LCpls Parker, Brown, Adams, McDonald, and Curry.

CLVII: Appellant has been denied equal protection of the law under the Fifth Amendment because his approved death sentence renders him ineligible for clemency by the Naval Clemency and Parole Board, while all other cases reviewed by this Court are eligible for such consideration. *But see Thomas*, 43 M.J. at 607.

CLVIII: Aggravating circumstances 8–11 and 13–14 are improper because they are derived from objectionable victim-impact evidence.